## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **v.** ) | **Crim. No. 13-335 (RJL)** |
| ) | |
| **JOSEPH DANIEL HALLFORD,** ) | |
| ) | |
| **Defendant.** ) | |

---

## DEFENDANT JOSEPH HALLFORD'S PROPOSED
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Defendant Mr. Joseph Hallford, through undersigned counsel, respectfully submits the following Proposed Findings of Fact and Conclusions of Law in connection with Mr. Hallford's motions to suppress physical evidence and statements.  This pleading incorporates the evidence adduced at the evidentiary hearing the Court held on June 6, 11, and 23, 2014.

## PROPOSED FINDINGS OF FACT

**A.      Background.**

On August 5, 2013, Mr. Hallford traveled from his home in Slocomb, Alabama to Washington, D.C. so he could participate in the "Million Mask March" ("the March"), a political demonstration.  Mr. Hallford's plan was to come to D.C. for the March and then travel to Texas thereafter to spend time with his girlfriend and her children.  On November 4th, shortly before he left, Mr. Hallford visited with his ex-wife, Jennifer Hallford, who described Mr. Hallford as disoriented at that time.  6/11/14:115-16.

Mr. Hallford has been a hemophiliac since birth.  Hemophilia is a serious blood disorder where the afflicted person's blood does not clot properly.  6/11/14:41.  In the absence of Factor

VIII, a blood-clotting agent taken by intravenous injection, hemophiliacs such as Mr. Hallford experience swelling at their joints that can cause severe pain.  Mr. Hallford relies on Factor VIII to live.  6/11/14:41 (Dr. O'Brien:  "Basically [hemophiliacs] need it for the blood to clot.  The factor VIII is a clotting factor and when a hemophiliac who is genetically unable [to] make factor VIII doesn't have it, then they could bleed to death so they need it in order to maintain their ability to clot their blood.").  While Mr. Hallford's medical condition has always caused him depression, that depression had intensified in the months prior to November 6th, to include weight loss, insomnia, and anhedonia (i.e., lack of motivation).  6/5/14:205 (testimony of Dr. Dierich Kaiser).

After leaving Alabama for Washington, D.C. on August 5th, Mr. Hallford drove all night, staying only briefly at a Super 8 motel in College Park, Maryland along the way.  Mr. Hallford headed to the March early on the 6th, parking on the Mall and participating in the event in the area of the White House.  At one point, Mr. Hallford opened his coat to several horse-mounted United States Park Police ("USPP") Officers and said something about shooting an unarmed man.  6/5/14:173.  Overall, however, Mr. Hallford found the event disorganized and somewhat obscene.  6/5/14:96-97.  Mr. Hallford realized that the Park Police were there just doing their jobs.  6/5/14:174 (Agent Fox testifying that Mr. Hallford "realized that the Secret Service officers on the fence line had a job to do and they were no different than anyone else").  Mr. Hallford left the rally and began looking for his car, so that he could leave for Texas.  Mr. Hallford could not find his car, however, which resulted in him walking a long distance while in a weakened condition from his hemophilia.  His joints began to swell, causing him to bleed and experience significant physical pain.

At approximately 2:08 pm, the "USPP" received a call regarding a sick person at the Korean War Memorial.  Upon arrival, the officers found Mr. Hallford (the person who was the subject of the call) to be weak and disoriented as a result of walking around all day without his hemophilia medications.  6/11/14:33-34.  His eyes were glazed over.  6/11/14:34.  Mr. Hallford was described by Park Guide Susan Philpot as exhibiting "odd behavior" and being visibly disoriented.  6/11/14:37.  Mr. Hallford stated that his hemophilia medications were back at his motel in College Park, MD, but that he could not remember where he parked his car.  *Id.*  The Park Guides assisted Mr. Hallford by putting him in a cab to take him back to the motel.  *Id.*  After a failed attempt to locate his car, Mr. Hallford had the taxi take him to the emergency room at George Washington Hospital ("GW"), so that he could obtain medication to ameliorate the physical pain and other symptoms from which he was suffering related to his hemophilia.  6/11/14:37-38.

Once at GW, Mr. Hallford admitted himself and requested immediate medication.  By this time, the physical and mental strain of Mr. Hallford's medical condition had led him to suffer a breakdown.  6/11/14: 39 (Dr. O'Brien:  "I think . . . that the confluence of stressors that he was experiencing was causing him to become increasingly anxious and depressed and also to have his perceptions and his verbalizations about his perceptions skewed in a more psychotic direction, if you will, so that he was sounding crazy and acting in an impulsive and unrestrained type of manner in terms of his verbal threats.").  The hospital staff reported that Mr. Hallford told them that he had tried to provoke the Secret Service to shoot him while at the March.  Also, after waiting some time for pain medication, Mr. Hallford apparently commented to a member of the hospital staff that he would "bash the doctor's head in" if the doctor did not come back soon.

Based on these alleged comments, a social worker at GW initiated an FD-12, which is an

application for an involuntary commitment order.  As a result, Mr. Hallford was detained and

subsequently transferred to the United Medical Center ("UMC") for involuntary commitment, as

GW does not hospitalize people against their will.  6/5/14:187.

**B.     Agent Brian Fox.**

United States Secret Service ("USSS") Agent Brian Fox and his partner, Agent John

Maher ("the agents"), were assigned to the USSS's protective intelligence squad on November 6,

2013.  6/5/14:5.  This team is responsible for investigating any threats against, or unusual interest

in, USSS protectees.  The agents dress casually and carry handguns in their waistbands beneath

their clothing.  6/5/14:10-12.  On November 6, 2013, the USSS agents received an email from

their operations center reporting a call that the USSS had received from GW  6/5/14:13.  The

email reported on a "direction of interest" towards the USSS from a patient at GW.  6/5/14:29.

The email stated as follows:

> GW social worker . . . notified the WFO PI desk of a patient, Joseph
> Daniel Hallford (NRID), who while being evaluated stated that he dared the
> USSS to shoot him in the chest because he wants his family to own the
> USSS. . . .  He walked in to the GW emergency room with bleeding to his leg
> and ankle this morning.  Palmeri stated that Hallford did not make any threats
> toward USSS protectees.  Palmeri described the Subject's demeanor as very
> calm, but significantly unpredictable.  She stated that he is displaying
> behaviors indicative of a possible mental health disorder.  The Subject has
> not been medicated.  Palmeri advised that today the Subject will be
> transferred to [UMC] for an involuntary psych evaluation.

Gov. Ex. 2.  Based on the email, the agents went to GW to attempt to interview Mr. Hallford.

Agent Fox testified that being informed of Mr. Hallford's  possible mental health issues did not

affect his approach to carrying out the assignment.  6/5/14:32-33.  Agent Fox stated that it was

important to know if a subject had been medicated or not, however, only because "if we respond out for the interview [and] we get there and they are completely unresponsive, we won't be able to even conduct the interview" which "serves no purpose." 6/5/14:33-4. Agent Fox testified that the agent's concern with a subject's medication is to determine whether or not they will have the ability to have "a lucid conversation with us." 6/5/14:34.

Once at GW, the agents requested to speak with Mr. Hallford and the individual who had reported him to the USSS. After waiting several minutes, the agents were taken to speak to Ms. Palmeri, the reporting individual, who stated that Mr. Hallford had admitted himself to GW with a bleeding disorder. 6/5/14:117. Ms. Palmeri said while Mr. Hallford was at UMC he had made statements about wanting to be shot by USSS, and that, in reference to Mr. Hallford's need for pain medications, he had threatened to bash a doctor's head in. 6/5/14:37-38. The agents also learned that Mr. Hallford was taking antidepressants and was exhibiting "paranoid delusions" about the government. 6/5/14: 39; *see also* 6/5/14: 124. Agent Fox believed that all of the events at GW related to Mr. Hallford's need for pain medication. 6/5/14: 125 (Agent Fox: "[t]he way I took the whole hospital thing was it was [a] dispute that he wanted medication").

The agents were informed by the UMC hospital staff that Mr. Hallford had been involuntarily committed and transferred to UMC, pursuant to a Superior Court involuntary commitment order. 6/5/14:40. Mr. Hallford was transferred in an ambulance on a gurney with restraints on his limbs. 6/5/14:127. Agent Fox understood that an involuntary commitment order meant that Mr. Hallford was going to be involuntarily detained at UMC based on his mental condition. 6/11/14:16; *see also* 6/5/14: 106. Agent Fox also understood on November 6, 2013 that the standard for an involuntary commitment order is whether the person suffers from a

5

mental health problem such that he is a danger to himself or others.  *Id.*

Agents Fox and Maher then went to UMC to interview Mr. Hallford.  6/5/14:41, 138.
The agents did not ask UMC personnel for permission to speak with Mr. Hallford, nor did they
ask if he would consent to an interview.  6/5/14:138.  Despite the information that they had
received regarding Mr. Hallford's mental condition and physical ailments, the agents did not ask
to speak to Mr. Halllford's physician or psychiatrist or anyone else about Mr. Hallford's mental
health or medical status.  6/5/14:130.  The agents simply presented themselves at UMC and told
the UMC personnel that they were there to speak with Mr. Hallford.  6/5/14:138.  Agents Fox
and Maher were then escorted by two security officers to the fourth floor, which Agent Fox
understood to be the Behavioral Health Unit, where patients are involuntarily committed for
mental health issues.  6/5/14:42.  The security officers escorted the agents into a hallway which
required an employee key card to access.  *Id.*  The door on the other side of the hallway leading
to the patient area was also secured with keycard access only.  6/5/14:133.  Agent Fox later
learned that at some time subsequent to November 6th, Mr. Hallford had tried to leave the 4th
floor when the secure doors were momentarily open, but was physically restrained and returned
to his room.  6/5/14:133-34.

Once in the secured hallway, two or three hospital staff members brought Mr. Hallford
out to the agents.  The hospital staff asked the agents whether they wanted to go into the adjacent
room, described as a "doctor's lounge," to speak to Mr. Hallford.  That room was adjacent to
several small doctor's offices.  6/5/14:47-48.  The agents agreed and Mr. Hallford was escorted
into the room by hospital personnel.  Agent Fox entered the room behind Agent Maher, Mr.
Hallford, and the hospital staff accompanying him.  The room contained a round table and

several chairs, as well as a small microwave and refrigerator. *Id*. As noted, the hallway directly outside the interview room was secured by doors on either side, which required an employee keycard to access. 6/5/14:42. Mr. Hallford did not have a key card to open the secure doors on either side of the hallway as he was involuntarily committed and not free to leave UMC in general or the secure part of the 4th floor in particular. 6/5/14:140-41 (Agent Fox: "He was not free to leave the facility, yes."). While Agent Fox speculated that a doctor might have taken Mr. Hallford back to his room if he had so requested, that was never explained to Mr. Hallford. 6/5/14:141-42.

When Mr. Hallford was brought out to the agents, he was wearing only a hospital gown. 6/11/14:13. Agent Fox testified that Mr. Hallford looked "kind of nervous" and "unsure of what was going on a little bit, or unsure of, you know, who we were." 6/5/14:44. After the agents identified themselves as Secret Service, Mr. Hallford asked if he was under arrest or in trouble. 6/5/14:51. Agent Fox told Mr. Hallford that he was not in trouble and that he and Agent Maher were there to investigate statements Mr. Hallford had allegedly made that caused "concern with the Secret Service." 6/5/14:51. The agents explained that they wanted to speak with him about the statements. 6/5/14: 52 (Agent Fox: "When I addressed him, I just said, you know, I am with the Secret Service, this is my partner, and, you know, we would like to, you know, talk to you.").

When Mr. Hallford first sat down, Agent Fox used his cellphone to take a photograph of Mr. Hallford.[1] Agent Fox did not ask Mr. Hallford's permission to take the photograph; he just

---

[1]    This important fact (which contradicted some of the facts to which Agent Fox testified) was entirely omitted from Agent Fox's direct examination. The photograph he took on November 6th — and which Agent Fox testified that he sent to the prosecution at that time — was not produced to the defense until after Agent Fox's testimony had been completed.

took it, while telling Mr. Hallford he was going to do so.  6/5/14:151.  The photograph shows

Mr. Hallford sitting down in a straight-backed chair, wearing a hospital gown, with a distressed

look on his face.  *See* Def. Ex. 5 (photograph of Mr. Hallford on November 6, 2013).

On direct examination, Agent Fox repeatedly testified that Mr. Hallford was seated in the

"blue chair," which was the most comfortable-looking of the chairs.  6/5/14:52 ("Q: Do you

recall what type of chair Mr. Hallford was seated in when you first addressed him?  A:  I believe

it was the blue – blue chair."); 6/5/14:55 ("I believe [the blue chair] was the chair he sat in

because it seemed like it was . . . more of a lounge chair that he sat in, whereas the chairs we sat

in were stiffer.").  Once the defense elicited that Agent Fox had actually taken a photograph of

Mr. Hallford at the outset of the interview — a fact that was not brought out during the

government's direct examination — and the photograph was finally produced, Agent Fox

changed his testimony as the photograph made clear that Mr. Hallford was not sitting in the more

comfortable blue "lounge chair."

Once the agents and Mr. Hallford were seated, the interview began.  6/5/14:58.  Agent

Fox admitted — and his definitive interview memorandum reflects — that Mr. Hallford was

"shivering and appeared extremely tired" during the interview.  6/5/14:142; *see also* Def. Ex. 1

(USSS Memorandum dated November 21, 2013) ("The subject was shivering and appeared

extremely tired.").  Mr. Hallford told the agents that he had not eaten or slept in a couple of days.

6/5/14:147.  Mr. Hallford's statements were consistent with the agents' observations.

6/5/14:148; *see also, e.g.*, 6/5/14:152 ("he did seem like he had a very long couple of days").

While already aware that Mr. Hallford had been admitted to GW with a bleeding disorder, the

agents learned from Mr. Hallford that he was currently suffering from the "serious bleeding

disorder" of hemophilia.  6/5/14:152.

According to Agent Fox, Mr. Hallford later in the interview appeared calm, even smiling at times and making a few jokes.  6/5/14: 78.  Agent Fox also noted, however, that the mere fact that someone appears calm is not a basis for drawing conclusions about their mental health. 6/5/14: 103-04.  Agent Fox stated that Mr. Hallford became emotional and began crying when he talked about his father, his children, and "his physical ailment."  *Id.*; *see also* 6/5/14:79 (stating that Mr. Hallford became emotional "[w]hen he talked about his father, when he talked about his physical ailment, how it make him feel at times and, you know, that his kids kind of kept him going"); 6/5/14:170 (Agent Fox describing Mr. Hallford as "emotional and crying").

At no point during the interview did either agent read Mr. Hallford his *Miranda* rights. The agents did not tell Mr. Hallford that had the right to remain silent, that he had a right to a lawyer, or that he was free to leave the interview at any time.  6/5/14:138 (Agent Fox:  "I never told him he had the right to say no.").  The agents never clarified to Mr. Hallford that they had no role in his involuntary commitment at UMC, including whether and when he could be released from UMC.  6/5/14:157.

The information collected from Mr. Hallford during the interview was recorded by Agent Fox in a PI "Quick Data Sheet," which was admitted into evidence as Government Exhibit 4. The Quick Data Sheet includes, among other things, a description of the event, Mr. Hallford's biographical information, and a brief medical history.  Mr. Hallford informed the agents that he was currently taking Prozac and had been previously diagnosed with an adjustment disorder. 6/5/14:63. Agent Fox recorded that Mr. Hallford had been involuntarily committed at a mental hospital on an earlier occasion in Alabama when he had told a police officer that he would rather

die than deal with him.  6/5/14:64.

During the course of the interview, Mr. Hallford informed the agents that he had driven all night from Alabama to D.C. and that he had not slept in quite some time.  6/5/14:80.  He told the agents that he had not eaten recently and that he had gotten lost and was suffering physical pain when he was walking around the Mall looking for his vehicle.  *Id*.

Towards the end of the interview, the agents asked Mr. Hallford if he owned any weapons, a potentially incriminating question (particularly when in the District of Columbia). *See, e.g.*, 6/5/14:175 (Court noting that the weapons question the agents had asked Mr. Hallford could result in him incriminating himself).  This question came after the agents learned the information about Mr. Hallford's mental and physical condition.  6/5/14:156.  Mr. Hallford responded that he had three firearms, which he initially thought were stored at his house in Alabama.  Mr. Hallford quickly corrected himself as he recalled that the weapons were in the vehicle he had driven to D.C.  6/5/14:71.  Mr. Hallford noted that there were some other items in the vehicle that would "look bad," including a Molotov cocktail, a gasoline canister, and a propane tank.  Mr. Hallford explained that he kept these items for his personal protection because he had previously been jumped by a gang in Alabama.  6/5/14:72-73.  Agent Fox did not directly hear Mr. Hallford make the statements about these additional items because he was out in the hallway making a phone call during that time.  6/5/14:76.  At the very end of the interview, the agents asked for consent to search Mr. Hallford's car without a warrant.  Mr. Hallford did not consent.  6/5/14:77.  The agents also asked Mr. Hallford to sign an SF-1945, which informs a person of his right not to have the government review their psychiatric records, and requires a signature.  6/5/14:163.  Having had that right explained to him, Mr. Hallford declined to sign.

6/5/14:164.

Agent Fox estimated that the interview lasted just under an hour, based on the time stamp of an email he sent after the conclusion of the questioning.  6/5/14:66.  Mr. Hallford again asked Agent Fox if he was under arrest and if there would be a prosecution based on the interview. 6/5/14:82.  Agent Fox said that he was not arresting him and that prosecution was not his decision.  *Id.*  Agent Fox then exited the interview room with "a group" of doctors and orderlies, briefly leaving Mr. Hallford and Agent Maher alone in the room.  6/5/14:83.  Agent Fox testified that the door accidentally shut behind him, which he promptly reopened to allow the other two men to exit.  *Id.*  Hospital staff then escorted Mr. Hallford back to his room in the secure wing of the 4th Floor while the agents left.

Agent Fox participated in a second law enforcement interview of Mr. Hallford two days later, on November 8, 2013, after Mr. Hallford had been treated at UMC for several days. 6/5/14:161-63.  At that time, law enforcement read Mr. Hallford's *Miranda* rights to him. Having had his rights explained to him, Mr. Hallford invoked those rights.  6/5/14:162.

**C.      Dr. Dierich Kaiser.**

While at UMC, Mr. Hallford was evaluated by UMC staff psychiatrist Dr. Dierich Kaiser, who testified to his observations of Mr. Hallford's psychiactric state while he was involuntarily committed there.  Dr. Kaiser was aware that Mr. Hallford had reported significant physical pain while at both GW and UMC.  6/5/14:191-95.  He noted that Mr. Hallford received low doses of pain medication during his involuntary commitment, possibly because of ailments that were related to his hemophilia.  6/5/14:195.  Dr. Kaiser testified that Mr. Hallford was originally admitted as a transfer from GW with a diagnosis of "psychosis not otherwise specified."

11

6/5/14:198.  He said that Mr. Hallford presented with "primarily paranoid and persecutory delusions."  6/5/14:199.  Dr. Kaiser participated in the process to extend Mr. Hallford's involuntary commitment at UMC beyond the 24-hour commitment authorized by the FD-12 as the "certifying physician."  6/5/14:199-200.

On November 7, 2013, the day after Mr. Hallford's interview with the USSS, Dr. Kaiser diagnosed Mr. Hallford as having schizoaffecitve disorder, where a person experiences mood instability in addition to psychotic symptoms such as hallucinations or delusions.  6/5/14: 201. His certification reflected that Mr. Hallford would not eat.  *Id.*  Dr. Kaiser testified that Mr. Hallford had been repeatedly requesting his release and had to be medicated on an emergency basis while at UMC.  6/5/14: 202-03.  During his two days at UMC, Mr. Hallford was given a plethora of medications, including Zyprexa (an anti-psychotic medication used for psychosis), an intramuscular dose of the sedative Ativan, 6/5/14:203, Prozac, and Ambien.  6/5/14:207.  Dr. Kaiser said the Zyprexa "can help to improve a person's sense of reality when they are faced with rage [or] anger."  6/5/14:204.  He testified that Mr. Hallford's "perception of reality" was a problem for Mr. Hallford while hospitalized at UMC.  *Id.*

**D.     Dr. John O'Brien.**

Mr. Hallford was also later evaluated by Dr. John O'Brien, a psychiatrist with decades of psychiatric experience, including work for state and federal courts assessing defendants for mental health conditions.  6/11/14:18-21.  The defense asked Dr. O'Brien to assist in determining Mr. Hallford's state of mind during the USSS interview on November 6, 2013.  6/11/14:20.  Dr. O'Brien reviewed Mr. Hallford's physical and mental health records in addition to the legal documentation associated with the instant case in coming to his conclusions.  6/11/14:23.  The

12

medical records Dr. O'Brien reviewed included records from Mr. Hallford's hospitalization at GW on November 5; at UMC on November 6-8; and from when Mr. Hallford was re-admitted to GW from November 8-12, 2013, following a head injury Mr. Hallford sustained, either at UMC or while in his cell at CTF.[2]  6/11/14:23-26.  Dr. O'Brien also reviewed medical records from Mr. Hallford's past hospitalizations and the treatment records from Mr. Hallford's hemotologist. 6/11/14: 53-54.

Dr. O'Brien opined that Mr. Hallford tended to exhibit episodes of anxiety or depression in direct correlation to the treatment of his hemophilia; i.e., he would experience psychotic symptoms when he underwent additional stress beyond that normally associated with managing his medical condition.  This observation is corroborated by the fact that Mr. Hallford's hematologist previously put him on psychiatric medication to manage the psychiatric symptoms he was exhibiting as a result of the constant pain and management of his condition.  6/11/14:26-27.  Dr. O'Brien noted that Mr. Hallford's anxiety level was particularly high on November 6, 2013 because in addition to the daily stress associated with managing his hemophilia, he experienced the added stress of lacking access to his medications, which he needs to live. 6/11/14:33.  When asked by the Court whether there was a linkage between Mr. Hallford's threatening statement at GW concerning the doctor and GW's refusal to provide Mr. Hallford with medication, Dr. O'Brien answered, "yes, this was again a very good example of how he gets increasingly stressed when he senses or he experiences lack of access to his – what he needs in terms of his treatment.  There was also documentation of a significant reduction in his anxiety

---

[2]     A record from the November 8th admission to GW states that Mr. Hallford was "obviously altered" when he admitted himself there on November 5th.

[when he received medication], and that's the only way it is described in the particular note in the Emergency Room when he administered this pain medication." 6/11/14:40; *see also* 6/11/14:100 (Dr. O'Brien: "Yes, in my opinion, it is documented in the records that both administration and treatment for the hemophilia and administration of pain medication to treat his arthritic pain are two areas of treatment or two types of treatment that when he becomes deprived of them, he becomes acutely symptomatic from a psychiatric perspective in terms of anxious[ness] and stress."). Additionally, Mr. Hallford's lack of sleep and food prior to his interview elevated his already increased stress level into the category of "something more prominently psychiatric, which is what's documented in his GW records and [UMC] records." 6/11/14:32, 39 (stating "the confluence of stressors that [Mr. Hallford] was experiencing were causing him to become increasingly anxious and depressed and also to have his perceptions and verbalization skewed in a more psychotic direction").

Because of this abnormally elevated stress level, Dr. O'Brien concluded that Mr. Hallford was not able to "appreciate the gravity of the circumstances" or "be aware of his ability to decline" an interview with the Secret Service on November 6, 2013. 6/11/14:45. Dr. O'Brien attributed this vulnerability to the fact that Mr. Hallford was exhibiting psychotic symptoms, had not been given appropriate psychiatric treatment, and was physically debilitated by his lack of treatment for his hemophilia at UMC. 6/11/14:25 (noting that Mr. Hallford was re-hospitalized at GW on November 8th to stabilize his hemophilia which was not treated at UMC). These factors combined likely rendered Mr. Hallford vulnerable to "being seduced into speaking with [the agents and] thinking that they were his ticket out." 6/11/14:45-46. Dr. O'Brien further testified that Mr. Hallford's medical issues, in addition to the added stressors of not eating or

sleeping before the interview, likely undermined Mr. Hallford's ability to make decisions for himself, which is further illustrated by Mr. Hallford's threats to emergency room personnel. 6/11/14:117 (noting, "[w]hat you are seeing in that sort of situation is a person who is not able to exercise the judgment and the self-restraint in order to basically further their objective; and in my opinion, that's a very good example of how impaired he was at the time").  As part of summarizing his overall opinion of Mr. Hallford's mental state on November 6th, Dr. O'Brien testified as follows:

> In my opinion, he was an individual who perceived that the Secret Service would help him get out of the hospital.  Obviously he wanted to leave the next day himself.  And he was not somebody who was able to appreciate the gravity of the circumstances or able to assess his – even assess or be aware of his ability to decline to the Secret Service.

> And he in my opinion was significantly vulnerable to being seduced into speaking with [them] thinking that they were his ticket out and clearly they weren't.  That's my major concern about the recurrently and consistently psychiatric symptoms he was exhibiting, his physically debilitated state and the fact that he had not yet been afforded appropriate psychiatric treatment which in my opinion has significantly improved his symptoms and reduced his stress level since that time.

6/11/14:45-46; *see also* 6/11/14:100 (stating that Mr. Hallford "perceived that they would have impact on his ability to get out and he was in a debilitated state and very symptomatic from a psychiatric perspective and got an injection of medicine right after they left [] presumably"); 6/11/14:102 ("I think that his debilitated state rendered him unable to consistently assert his wishes at that time; but I also think he was completely unaware of the gravity of the circumstances.").[3]

---

[3]     The defense mistakenly failed to order the transcript for June 23, 2014, the final day of the evidentiary hearing.  Counsel will be obtaining that transcript tomorrow, July 30, 2014, and will seek to file a brief supplement if there is any further record material from that day

## PROPOSED CONCLUSIONS OF LAW

**I.     THE STATEMENTS TAKEN FROM MR. HALLFORD AND THE PHYSICAL
        EVIDENCE RECOVERED AS A RESULT OF THOSE STATEMENTS MUST BE
        SUPPRESSED BECAUSE MR. HALLFORD'S STATEMENTS WERE NOT
        VOLUNTARILY GIVEN.**

### A.     Burden of Proof.

The government bears the burden of demonstrating that Mr. Hallford's statements were

voluntary.  *Lego v. Twomey,* 404 U.S. 477, 489 (1972); *United States v. Leon Guerrero,* 847 F.2d

1363, 1365 (9th Cir. 1988); *United States v. McVicker,* 979 F. Supp. 2d 1154 (D. Or. 2013).  A

confession is deemed voluntary if the government proves by a preponderance of the evidence that

it was not obtained through psychological or physical disadvantage but instead was the product

of a rational intellect and free will.  *See, e.g.*, *United States v. Montgomery,* 14 F.3d 1189, 1194

(7th Cir.1994); *see also United States v. Fenton*, 1998 WL 356889, at *10 (W.D. Pa. May 20,

1998) ("But the burden of proof rests with the Government, and it has failed to satisfy me that a

man who was simultaneously released from a mental health commitment and arrested, and who

was 'nervous and upset' at the time he was given *Miranda* warnings by one officer, knew that

when he responded in the affirmative to those warnings he did not have to participate in a later

interview with federal agents.").

### B.     The Involuntariness Doctrine.

The right against compulsory self-incrimination is "the mainstay of our adversary system

of criminal justice, and . . . one of the great landmarks in man's struggle to make himself

civilized."  *Michigan v. Tucker*, 417 U.S. 433, 439 (1974) (internal quotation marks and citation

---

that should be brought to the Court's attention.

omitted).  "This principle, branded into the consciousness of our civilization by the memory of the secret inquisitions, sometimes practiced with torture, which were borrowed briefly from the continent during the era of the Star Chamber, was well known to those who established the American governments." *Culombe v. Connecticut*, 367 U.S. 568, 581 (1961).  "Its essence is the requirement that the State which proposes to convict and punish an individual produce the evidence against him by the independent labor of it officers, not by the simple, cruel expedient of forcing it from his own lips." *Id.* at 581-82.

In implementing this bedrock constitutional value, the focus is on "whether [the] defendant's will was overborne by the circumstances surrounding the giving of [the] confession," an inquiry that "takes into consideration the totality of all the surrounding circumstances – *both* the characteristics of the accused *and* the details of the interrogation." *Dickerson v. United States*, 530 U.S. 428, 434 (2000) (internal quotation marks omitted) (emphasis added).

"Each of these factors, in company with all of the surrounding circumstances — the duration and conditions of detention (if the confessor has been detained), the manifest attitude of the police toward him, his physical and mental state, the diverse pressures which sap or sustain his powers of resistence and self-control – is relevant." *Culombe*, 367 U.S. at 602; *see also Withrow v. Williams*, 507 U.S. 680, 693-94 (1993).  Thus, the voluntariness inquiry "is not limited to instances in which the claim is that the police conduct was 'inherently coercive,'" *Miller v. Fenton*, 474 U.S. 104, 110 (1985) (quoting *Ashcroft v. Tennessee*, 322 U.S. 143, 154 (1944)), but applies equally when the interrogation techniques were improper because, in the particular circumstances of the case, the confession is unlikely to have been the product of a free and rational will." *Id.*  Ultimately, the voluntariness "determination depend[s] upon a weighing

of the circumstances of pressure against the power of resistance of the person confessing."
*Dickerson*, 530 U.S. at 434.

The above principles have particular application where, as here, the individual interrogated is plainly struggling with a mental condition.  "What might be overpowering to the weak of will or mind might be utterly ineffective against the experienced criminal."  *Stein v. New York*, 346 U.S. 156, 185 (1953).  As stated in the American Bar Association's Criminal Justice Mental Health Standards:  "Official conduct that does not constitute impermissible coercion when employed with nondisabled persons may impair the voluntariness of the statements of persons who are mentally ill[.]"  ABA Criminal Justice Mental Health Standards, Standard 7-5.8(b);[4] *see also Colorado v. Connelly*, 479 U.S. 157, 164 (1986) (noting that "as interrogators have turned to more subtle forms of psychological persuasion, courts have found the mental condition of a defendant a more significant factor in the 'voluntariness' calculus"); *Mincey v. Arizona*, 437 U.S. 385, 399 (1978) (noting that a person's "[m]ental condition is surely relevant to an individual's susceptibility to police coercion"); *United States v. Taylor*, 745 F.3d 15, 23 (2d Cir. 2014) ("An individual's mental state should be considered in the voluntariness inquiry to the extent it allowed law enforcement to coerce the individual.").[5]

"A confession is not voluntary when obtained under circumstances that overbear the defendant's will at the time it is given."  *Taylor*, 745 F.3d at 23 (quotation marks omitted).  A

---

[4]     Available at:
http://www.americanbar.org/publications/criminal_justice_section_archive/crimjust_standards_mentalhealth_toc.html.

[5]     For the above discussion and further discussion of the involuntariness doctrine, *see United States v. Preston*, 751 F.3d 1008, 1020 (9th Cir. 2014) (en banc), a recent en banc opinion of the Ninth Circuit regarding the involuntariness doctrine.

court must consider the "totality of the circumstances" in making this determination. *Fenton*, 474 U.S. at 116. Courts must "weigh, rather than simply list," the relevant circumstances, and weigh them not in the abstract but "against the power of resistance of the person confessing." *Doody v. Ryan*, 649 F.3d 986, 1015-16 (9th Cir. 2011) (en banc).

### C.  Mr. Hallford's Statements Were Involuntary.

At the time of his interview with Agents Fox and Maher on November 6th, Mr. Hallford was in acute distress. He was suffering physical symptoms from his hemophilia, as well as psychotic symptoms that arise when he senses a loss of control over his physical health. *See, e.g.*, *United States v. Preston*, 751 F.3d 1008, 1020 (9th Cir. 2014) ("We begin with consideration of Preston's reduced mental capacity, a factor that is critical because it may render him more susceptible to subtle forms of coercion." (brackets and internal quotation marks omitted)). The record demonstrates that Mr. Hallford's physical and mental condition not only explains Mr. Hallford's erratic behavior at GW and UMC in the first place, but that it also undermined Mr. Hallford's ability to decide independently whether to submit to the agents' questioning on November 6th.

The USSS Agents were sufficiently aware of what Mr. Hallford was going through that they should not have conducted the November 6th interview of Mr. Hallford without at least taking some further precautions to ensure that he was speaking to them voluntarily. *See, e.g.*, *United States v. Hall*, 93 F.3d 1337, 1346 (7th Cir. 1996) (in determining whether defendant's confession was coerced, court acknowledged that "[i]f a defendant has a mental impairment that was known or reasonably apparent to the interrogators, they must exercise special care."). At the time of the interview, the USSS agents knew they were dealing with someone suffering from a

mental health disorder serious enough that he had been involuntarily committed to the Behavioral

Health Unit at UMC.  They knew Mr. Hallford had been suffering from physical pain and had

been in desperate need of medication; indeed, they knew Mr. Hallford's physical condition was

serious enough that he had admitted himself to GW and that he had made threats over his need

for pain medication.  And yet, instead of taking at least minimal steps to ensure that Mr. Hallford

understood that he interview was a voluntary one — such as the reading of Mr. Hallford's

*Miranda* rights, *see supra* — the USSS agents did *nothing* to communicate Mr. Hallford's rights

to him.  By Agent Fox's own admission, his only concern in the situation was whether Mr.

Hallford was capable of a "lucid conversation," 6/5/14: 34; that is not the test for whether a

defendant's statements are voluntarily made.

It is undisputed that the USSS agents did not administer Mr. Hallford the warnings

required under *Miranda v. Arizona*, 384 U.S. 436 (1966), a key factor in determining the

voluntariness of a suspect's confession.  In *Colorado v. Connelly*, 479 U.S. 157 (1986), the

defendant was administered his *Miranda* warnings multiple times prior to inculpating himself.

*Id.* at 160.  In *Mincey,* the Supreme Court found that the defendant's statement from a hospital

bed was involuntary *despite* the administration of *Miranda* warnings.  437 U.S. at 396-99; *see

also United States v. Murdock*, 667 F.3d 1302, 1307 (D.C. Cir. 2012) (concluding that "[t]he

detective's failure to honor Murdock's *Miranda* rights is certainly relevant to whether Murdock's

statements were voluntary").

But even setting aside their decision not to administer Mr. Hallford's *Miranda* rights, the

USSS agents did nothing to dispel any belief on Mr. Hallford's part that this interview was

required of him – particularly if he was to have any hope of leaving UMC and heading home.

20

Under the totality of the circumstances here, it is clear that Mr. Hallford did not understand that he had any choice but to speak with the USSS agents, and that his statement was accordingly involuntary.

## II.     MR. HALLFORD'S STATEMENTS WERE TAKEN IN VIOLATION OF *MIRANDA* AS MR. HALLFORD WAS IN CUSTODY FOR MIRANDA PURPOSES AT THE TIME OF THE NOVEMBER 6TH INTERVIEW.

The government and the defense agree that the sole issue for determining whether Mr. Hallford's statements must be suppressed as taken in violation of *Miranda* is whether Mr. Hallford was in custody during the November 6, 2013 interview.

### A.     The Law of *Miranda* Custody.

In determining whether a person is in custody for *Miranda* purposes, courts ascertain whether, in light of "the objective circumstances of the interrogation," *Stansbury v. California*, 511 U.S. 318, 322-23, 325 (1994), a "reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave," *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). Put another way, *Miranda* applies "in all settings in which [a person's] freedom of action is curtailed in any significant way."[6] *Miranda*, 384 U.S. at 467. In *Berkemer v. McCarty*, 468 U.S. 420, 440, 442 (1984), the Supreme Court confirmed that a determination of custody for *Miranda* purposes hinges on whether a person "is subjected to treatment that renders him 'in custody' for practical purposes[.]" *Id.* The Court in *Berkemer* stated that "the only relevant

---

[6]     Given the reality that police interrogators "trad[e] on the weakness of individuals," i.e., their "insecurity about [themselves] or [their] surroundings," *Miranda*, 384 U.S. at 455, the Court in *Miranda* found the pre-interrogation warnings set out in the opinion to be "indispensable." *Id.* at 469. Those warnings, the Court elaborated, are "an absolute prerequisite in overcoming the inherent pressures of the interrogation atmosphere," *id.* at 468; they "insure" that the suspect is timely told of his Fifth Amendment privilege and his freedom to exercise it, *id.* at 469.

inquiry is how a reasonable man in the suspect's position would have understood his situation."
*Id.* "Once the scene is set and the players' line and actions are reconstructed, the court must apply an objective test to resolve "the ultimate inquiry": "[was] there a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Thompson*, 516 U.S. at 112.

### B.    Mr. Hallford Was In Custody During The November 6th Interview.

In this case, there were any number of factors that would have led a reasonable person in Mr. Hallford's position to believe he was in official custody.  To begin with, there is the fact that Mr. Hallford *was* in official custody, by virtue of his involuntary commitment at UMC, a government-run psychiatric hospital.  As the Supreme Court has stated, involuntary commitment to a mental hospital is a "massive curtailment of liberty."  *Humphrey v. Cady*, 405 U.S. 504, 509 (1972); *see also State v. Stott*, 794 A.2d 120, 134 (N.J. 2002) (holding that defendant who was involuntarily committed at a state psychiatric hospital after trying to commit suicide was in custody for *Miranda* purposes at the time he gave incriminating statements during police interviews).

A review of the circumstances of Mr. Hallford's detention on November 6th demonstrates that Mr. Hallford had (1) been forcibly detained at GW; (2) restrained and transferred to UMC pursuant to an involuntary commitment order; (3) summonsed by the USSS agents and then taken by UMC staff members to a secure space where the agents were waiting; (4) photographed in a hospital gown, without his permission; and (5) interrogated.  At no time was Mr. Hallford advised of his rights, or much less was he told he could go back to his room or otherwise terminate the interview.  Under these circumstances, any reasonable person in Mr.

Hallford's position would feel that he was not free to leave the interview.

The Supreme Court's opinion in *Howes v. Fields*, 132 S. Ct. 1181 (2012), strongly supports Mr. Hallford's position that he was in custody during the interrogation. *Fields* was a habeas case where the Supreme Court held that it was not "clearly established Federal law" for purposes of granting relief from a state court adjudication that a defendant was automatically "in custody" for *Miranda* purposes merely because the interview took place at a prison and concerned matters from outside the prison walls. *Id.* at 1187. The Sixth Circuit had found that isolation from the general prison population, combined with questioning about conduct occurring outside the prison, makes the interrogation of a prisoner custodial *per se. Id.*

The Supreme Court held that its precedents did not establish such a categorical rule. *See id.* at 1187 ("[O]ur precedents do not clearly establish the categorical rule on which the Court of Appeals relied, i.e., that the questioning of a prisoner is always custodial when the prisoner is removed from the general prison population and questioned about events that occurred outside the prison."). The *Fields* Court relied on three principal factors to reverse the lower court: (1) that "questioning a person who is already serving a prison term does not generally involve the shock that very often accompanies arrest," *id.* at 1190; (2) that "a prisoner, unlike a person who has not been sentenced to a term of incarceration, is unlikely to be lured into speaking by a longing for prompt release," *id.* at 1191; and (3) that a prisoner "knows that the law enforcement officers who question him probably lack the authority to affect the duration of his sentence." *Id.* The Court also placed significant emphasis on the fact that the officers in *Fields* told the defendant multiple times during the interrogation that he was free to leave the interview and return to this cell. *Id.* at 1193 ("Most important, respondent was told at the outset of the

interrogation, and was reminded again thereafter, that he could leave and go back to his cell whenever he wanted."); *see also id.* at 1195 (Ginsburg, J., concurring in part and dissenting in part) ("Critical to the Court's judgment is the undisputed fact that [Fields] was told that he was free to end the questioning and return to his cell." (internal quotation marks omitted)).

*Fields* strongly supports Mr. Hallford's position that he was in custody during the November 6th interview for *Miranda* purposes.  The three factors relied upon in *Fields* to reverse the lower court all militate in Mr. Hallford's favor in this case.

       **1.**      **"[Q]uestioning a person who is already serving a prison term does not generally involve the shock that very often accompanies arrest."**

On the first factor, at the time of the November 6th interview, Mr. Hallford was indeed suffering the "sharp and ominous change" involved in official detention, a change that "give[s] rise to coercive pressures."  *Id.* at 1190.  As the Supreme Court stated in *Fields*:

> When a person who is not serving a prison term is questioned, isolation may contribute to a coercive atmosphere by preventing family members, friends, and others who may be sympathetic from providing either advice or emotional support.  And without any such assistance, the person who is questioned may feel overwhelming pressure to speak and to refrain from asking that the interview be terminated.

*Id.* at 1191.  Without any meaningful due process or other contact with the outside world, Mr. Hallford had been forcibly transported and involuntarily committed to a government-run psychiatric hospital.  Mr. Hallford therefore was suffering a "sharp and ominous change" in his situation—precisely the kind of isolation from "family members, friends, and others who may be sympathetic" and who could "provid[e] [the] advice or emotional support" discussed in *Fields Id.*  Thus, there should be no debate that a reasonable person in Mr. Hallford's position would be acutely aware of the coercive change in circumstances that came with his official detention.

2.      **"[A] prisoner, unlike a person who has not been sentenced to a term of incarceration, is unlikely to be lured into speaking by a longing for prompt release."**

Second, Mr. Hallford was not under a determinate prison sentence but rather a temporary commitment order.  Thus, unlike in *Fields*, a reasonable person in Mr. Hallford's position would certainly have been "lured into speaking by a longing for prompt release."  *Id.* at 1191.  Indeed, the record in this case shows that Mr. Hallford was "seduced into speaking with [the agents by] thinking that they were his ticket out."  6/11/14:45-46 (testimony of Dr. O'Brien).

3.      **"[A] prisoner knows that his questioners probably lack authority to affect the duration of his sentence."**

And third, the *Fields* Court reasoned that "a prisoner, unlike a person who has not been convicted and sentenced, knows that the law enforcement officers who question him probably lack the authority to affect the duration of his sentence."  *Id.* at 1191.  Here the opposite is true.  Indeed, that is precisely why someone in Mr. Hallford would ask the USSS agents the question that he did:  "Am I in trouble?"  Unlike *Fields*, this is obviously a case where Mr. Hallford felt "compelled to speak by the fear of reprisal for remaining silent or in the hope of [a] more lenient treatment should he confess."  *Id.* at 296-97.  As noted, Dr. O'Brien opined directly that Mr. Hallford was likely "seduced into speaking with [the agents and] thinking that they were his ticket out."  6/11/14:45-46.

\* \* \*

Finally, the Supreme Court in *Fields* found it very significant—indeed, perhaps dispositive—that the officers had told Mr. Fields that he could terminate the interview at any time and return to his cell.  *See e.g.*, *id.* at 1193 ("Most important, respondent was told at the

outset of the interrogation, and was reminded again thereafter, that he could leave and go back to his prison cell whenever he wanted."). The majority opinion in *Fields* concludes with the following:

> Taking into account all of the circumstances of the questioning—*including especially the undisputed fact that respondent was told that he was free to end the questioning and return to his cell*—we hold that respondent was not in custody within the meaning of *Miranda*.

*Id.* at 1194 (emphasis added). By contrast, Mr. Hallford was never told that he could terminate the interview at any time, that he could return to his room, or anything remotely similar.

The interrogation component of *Miranda* concerns whether a suspect is "free to leave." Under the circumstances present here, a reasonable person would not have felt free to leave or terminate the interview; indeed, as set forth in Section I, Part B, a reasonable person in Mr. Hallford's position would have felt he had no choice but to speak with the USSS agents. Thus, Mr. Hallford was in custody for *Miranda* purposes, and his statements to the USSS agents must be suppressed.

## III.   THE PHYSICAL EVIDENCE MUST BE SUPPRESSED BECAUSE IT WAS DISCOVERED AS A RESULT OF MR. HALLFORD'S INVOLUNTARY STATEMENTS AND IS THEREFORE FRUIT OF THE POISONOUS TREE.

The government correctly points out that under *United States v. Patane*, 542 U.S. 630, 637 (2004), the Court need not suppress evidence recovered as a result of a defendant's statements given in violation of *Miranda*. However, *Patane's* limitation on the exclusionary rule does not apply where, as in Mr. Hallford's case, the statements were made involuntarily. As set forth in Section I, *supra*, the evidence demonstrates that Mr. Hallford's statements were made involuntarily. Accordingly, even under the government's view of the law, the physical evidence

must be suppressed as fruit of the poisonous tree.

## CONCLUSION

Based on the above, as well as the entire record in this matter, Mr. Hallford respectfully requests this Court to suppress the statements taken from him on November 6, 2013, as well as the physical evidence subsequently recovered as a result of those involuntary and un-*Mirandized* statements.

Respectfully submitted,

A.J. Kramer
Federal Public Defender

_____/s/_____
Jonathan S. Jeffress
Assistant Federal Public Defender
625 Indiana Ave., N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500