UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No. 13-0335 (RJL) |
| | ) | |
| JOSEPH DANIEL HALLFORD, | ) | |
| | ) | |
| Defendant. | ) | |

**FILED**

MAY – 6 2015

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

*th*

MEMORANDUM OPINION
May _6_, 2015 [## 10, 11]

Defendant Joseph Daniel Hallford ("Hallford" or "defendant") seeks to suppress

the statements – and the physical evidence obtained as a result of those statements – that

were made when he was questioned by agents of the United States Secret Service while

involuntarily committed to a local psychiatric hospital, United Medical Center ("UMC"),

on November 6, 2013.  *See* Mot. to Suppress Statements Taken in Violation of the

Constitution [Dkt. # 10]; Mot. to Suppress Evidence Seized in Violation of the

Constitution [Dkt. # 11].  Upon careful consideration of defendant's motions, the

Government's oppositions thereto, the testimony and arguments of counsel at the

evidentiary hearings,[1] the parties' supplemental pleadings, and the relevant law, the Court

GRANTS both motions.[2]

---

[1] Over the course of three days, this Court held evidentiary hearings, during which the
government called Park Police Detective Catherine Heller and Secret Service Agent Brian Fox,
and defendant called Dr. Dierich Kaiser and Dr. John O'Brien.

[2] The Court issued a ruling orally from the bench, granting both motions, on December 16, 2014.
In anticipation of the possibility of a government appeal, I noted that I would issue a written

## FACTUAL BACKGROUND

On November 6 of 2013, two U.S. Secret Service agents dressed in casual clothes assigned to the protective intelligence squad interviewed the defendant at UMC in Washington, D.C., where he was being involuntarily committed for a mental health evaluation. Tr. June 5, 2014 at 5:6-9, 10:10-16, 41. He was at UMC pursuant to a referral from the emergency room staff at the George Washington Hospital ("GW"). *Id.* at 40. The defendant, a native of Alabama, who was participating in the Million Mask March,[3] had voluntarily checked himself into the emergency room at GW earlier that day in the hope of getting certain medications necessary to deal with the extreme pain he was experiencing as a result of his hemophilic condition. *Id.* at 116:2-4, 114:14-17.

The agents who conducted the interview at UMC amazingly made *no* effort before summoning him for an interview to determine either his medical status, or the status of his psychological condition, prior to requesting the interview. They were, nevertheless, under the distinct impression (1) that he had bragged to GW personnel about taunting a White House Police Officer to shoot him during the Million Mask March, and (2) that he was in such physical distress while at GW that he had threatened to strike one of their physicians if he didn't get a particular pain medicine he needed. *Id.* at 37:18-23, 38:4-7.

---

opinion at a later time. *See* Tr. Dec. 16, 2014 at 14:12-20. Unfortunately, due to an 11-week criminal trial that began in early January 2015, I was not able to issue this opinion until now.

[3] The Million Mask March was a protest in Washington, D.C., that took place on November 5, 2013, where the protestors marched from the Washington Monument, to the White House, and ended at the U.S. Capitol Building. Many of the protestors wore Guy Fawkes masks, and the protest was associated with "Occupy Wall Street" and the internet group "Anonymous." The protest was aimed a wide variety of issues, including government policies that protestors believe favor the wealthiest "1%" of Americans.

As to his psychiatric condition, the agents also admitted knowing that he had been committed to UMC against his will and had not yet had a preliminary psychiatric evaluation by their staff. *Id.* at 40:2-12.

Towards the end of an hour long interview, during which they deceptively told defendant he would only be questioned about his threatening remarks at GW, and *after* concluding that the defendant did not pose a threat to anyone that the Secret Service protects or any of its employees, they decided to question him about whether he owned any weapons. *Id.* at 65:13-22, 100:18-101:23.  The agents, of course, had no reason to believe that this first-time visitor to Washington, D.C., was aware that it was illegal to possess a weapon in the District of Columbia.  Nevertheless, without administering any *Miranda* rights or warnings, they inquired about both his gun ownership and where in specific they were located. *Id.* at 159:9-18.

The defendant, not surprisingly, readily admitted to owning a pistol, a couple rifles, and a shotgun. When asked where they were being stored, he said they were being stored at his home in Alabama, but then corrected himself shortly thereafter and acknowledged that they were in the trunk of his car, which was parked somewhere in the District of Columbia near the National Mall. *Id.* at 71:2-13.   He also admitted to having other items in the trunk that might "look bad." *Id.* at 71:14-18.  One of those items apparently was the disassembled components of a so-called "Molotov cocktail." *Id.*  He said, when asked, that he kept the weapons in his trunk for personal protection because he had been previously been jumped by a gang in Alabama. *Id.* at 72:14-73:7.

As a result of these admissions, defendant's car was located and searched without a warrant by U.S. Park Police. *Id.* at 85:4-12. There police officers found the pistol, the handgun, ammunition, and the various ingredients of a possible "Molotov cocktail" that are the basis of the charges in this case. *Id.*; *see also* Gov't's Omnibus Opposition, at 7-8 [Dkt. # 12] (the "Opposition" or "Opp.") (listing contents of car).

Defendant contends he was in custody at the time of this interview and, therefore, seeks to suppress his statements to the agents, due to their failure to provide him with *Miranda* warnings. *See* Mot. to Suppress Statements Taken in Violation of the Constitution [Dkt. # 10]. In addition, defendant seeks to suppress the physical evidence seized from his car on the theory that his medical and psychological conditions combined that night were such that his statements were involuntarily given. Mot. to Suppress Evidence Seized in Violation of the Constitution [Dkt. # 11]. For the following reasons I agree with the defendant's position as to each issue.

## ANALYSIS

The suppression of defendant's statements without the benefit of *Miranda* warnings is, in this case, a relatively straightforward question turning on whether he was in custody at the time of his interview. *See Miranda v. Arizona*, 384 U.S. 436 (1966). To determine whether a person is in custody for *Miranda* purposes, courts ascertain whether, in light of "the objective circumstances of the interrogation," *Sansbury v. California*, 511 U.S. 318, 322-23, 325 (1994), a "reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave," *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). The Supreme Court has held that the determination of custody hinges on

4

whether a person is subjected to treatment that renders him, in practical terms, in custody. *Berkemer v. McCarty*, 468 U.S. 420, 440, 442 (1984). This inquiry is evaluated through the prism of how a reasonable man in the defendant's position would have understood his situation, *i.e.*, would a reasonable man have understood his situation to be a restraint of his freedom of movement akin to a formal arrest?

In this case, there are clearly a number of factors that would have led a reasonable person in the defendant's position to believe he was in custody. Defendant was, in fact, in official custody by virtue of his involuntary commitment. Indeed, he had been physically restrained when he was transferred from GW to UMC against his will. June 5, 2014 Tr. at 127:8-17. At UMC, the defendant was summoned by agents for an interview, not asked if he would submit to an interview. Indeed, the defendant was never told he could refuse to answer questions or suspend the interview at any time. Moreover, the defendant was escorted to the interview room at UMC, both coming and going, by a phalanx of hospital staff. The room itself was a secure room that had locked doors limiting access into and out of the room. Tr. June 5, 2014, at 42:2-24. In addition, shortly after entering the room, the agents took a photograph of the defendant in a hospital gown without his permission. *Id.* at 150:23-151:6. And, of course, he was interrogated without any warning of his *Miranda* rights, or even the right to stop the interview at any time. *Id.* at 158:13-159:18.

Under the totality of the circumstances, any reasonable person would have believed that he was not free to leave or terminate the interview. *See Thompson v. Keohane*, 516 U.S. 99, 112 (1995). Thus, because no *Miranda* warnings were given, the

defendant's statements to those agents that evening must be suppressed.  The remaining question, however, is a closer question, *i.e.*, whether the defendant's statements were obtained involuntarily.

The Supreme Court has made it clear that evidence obtained in the absence of *Miranda* warnings is not ordinarily suppressible unless obtained involuntarily.  *See United States v. Patane*, 542 U.S. 630, 640 (2004) ("We have repeatedly explained that those subjected to coercive police interrogations have an automatic protection from the use of their involuntary statements (or evidence derived from their statements) in any subsequent criminal trial." (citations and quotations omitted)).  The Government, of course, bears the burden of demonstrating the voluntariness of those statements by a preponderance of the evidence.  *Lego v. Twomey*, 404 U.S. 477, 489 (1972); *United States v. Wiggins*, 509 F.2d 454, 461 (D.C. Cir. 1975).

The Supreme Court has also been clear regarding the involuntariness inquiry that it is not limited to claims that the police conduct in question was inherently coercive.  *See Miller v. Fenton*, 474 U.S. 104, 110 (1985) (quoting *Ashcroft v. Tennessee*, 322 U.S. 143, 154 (1944).  For example, it is not necessary that the police employed restraints, manacles, or other such instrumentalities of inherent coercion.  The focus, rather, is whether the defendant's will was overborne by the totality of the circumstances surrounding his statements.  *See Dickerson v. United States*, 530 U.S. 428, 434 (2000).  Ultimately, the Supreme Court has said, it comes down to a weighing of the circumstances of pressure versus the power of resistance.  *Id.*  Courts thus should look at the defendant's conditions of detention, the attitude of the police toward the defendant,

the defendant's physical and mental state, and such diverse pressures which sap his powers of resistance and self-control. *See Culombe v. Connecticut*, 367 U.S. 567, 602 (1961); *see also Withrow v. Williams*, 507 U.S. 680, 693-94 (1993) (outlining factors courts use to determine whether a confession was voluntary). For the following reasons, I find under the totality of the circumstances that the Government has not met its burden to prove by a preponderance of evidence that the defendant's statements at UMC on November 6, 2013 were voluntary. How so?

The agents summoned the defendant to speak with them under circumstances where they did not know, and hadn't even tried to find out, his mental and physical well-being. To characterize their attitude as callous indifference to his health would be kind considering that they knew he was, at a minimum, suffering from a mental disorder, extreme anxiety, and in serious physical pain from an ailment of some kind. *See, e.g., See Colorado v. Connelly*, 479 U.S. 157, 164 (1986) (noting that "as interrogators have turned to more subtle forms of psychological persuasion, courts have found the mental condition of a defendant a more significant factor in the 'voluntariness' calculus");[4]

---

[4] The government contends that under *Connelly* the evidence must not be suppressed because there was no "coercive" police activity, which is a "necessary predicate" to a finding of involuntariness. 479 U.S. at 167; Opp. at 10. In *Connelly*, the police officer received a confession from a defendant suffering from hallucinations, but, at the time of the confession, the officer had no notice that the defendant might be suffering from any mental impairment. 479 U.S. at 160. Viewed in this light, *Connelly* stands for the unremarkable proposition that suppression is an inappropriate remedy where a defendant is mentally impaired but the police are completely unaware of the defendant's condition. *See id.* at 166 ("The purpose of excluding evidence seized in violation of the Constitution is to substantially deter future violations of the Constitution."). As discussed more fully below, in this case there were *multiple* warnings to the Secret Service agents that, had they bothered to inquire further, would have put them on notice that Hallford was suffering from an impaired mental state.

*Mincey v. Arizona*, 437 U.S. 385, 399 (1978) (noting that a person's "[m]ental condition is surely relevant to an individual's susceptibility to police coercion"); *United States v. Taylor*, 745 F.3d 15, 23 (2d Cir. 2014) ("An individual's mental state should be considered in the voluntariness inquiry to the extent it allowed law enforcement to coerce the individual."). Indeed, the agents learned shortly after they arrived that Hallford had only been at UMC a short amount of time and had not even been preliminarily evaluated yet by the psychiatric staff. And while they knew he had admitted himself to GW to deal with his severe physical pain, they didn't even attempt to understand the nature of his hemophilic condition and the correlation it had to the severe pain he was suffering from. *See* Tr. June 6, 2014, at 108:3-22. Moreover, they didn't even inquire whether UMC would be treating him simultaneously for his physical symptoms while diagnosing his mental condition.

The agents did know, however, and Hallford admitted, that he had previously been involuntarily committed to a psychiatric hospital in Alabama for a verbal altercation with a police officer where he said he would rather die than deal with him. *Id.* at 64:16-65:10. As to his physical condition in general, the agents did notice that he was shivering and appeared extremely tired. *Id.* at 142:9-14, 146:5-13. Indeed, the defendant, by his own admission, said he hadn't eaten or slept for several days. *Id.* at 147:15-17. As to his emotional condition, the agents also observed that the defendant at one point in the interview became so emotionally distraught when talking about his family and his chronic medical condition that he started crying uncontrollably. *Id.* at 170:4-8.

Notwithstanding all the agents observed, and all they didn't know about his physical and medical condition, and notwithstanding their own conclusion that the defendant posed no threat to anyone that the Secret Service protects or employs, the agents decided to ask him a series of questions *calculated* to possibly result in a self-incriminating admission about gun ownership in the District of Columbia.  Not surprisingly, the defendant fell into their trap and volunteered that he not only owned a pistol, a couple rifles, and a shotgun, but that they were in the trunk of his car parked somewhere near the mall.

Having snookered him into that self-incriminating admission, the agents, not surprisingly, didn't inform him that it was against the law to have such weapons in the District of Columbia.  They did, however, go ahead and ask his permission to search the auto without a warrant.  He declined.  *Id.* at 164:4-8.   They also asked him for written permission to review his psychiatric records.  He declined that, too.  *Id.* at 162:12-164:3. Two days later, after he had been treated at GW for both his painful hemophilic condition and a psychoactive disorder that had been diagnosed at UMC *after* the interview, the agents sought to interview him yet again.  Curiously, however, at a point when he was both physically and mentally stable they decided to administer *Miranda* warnings to him. As was his right, he declined to speak with them further.  *Id.*

The delicacy of the defendant's mental condition at the time of his initial interview was also evaluated by an expert, Dr. John O'Brien, who testified before the Court at the suppression hearing.  The Court found his testimony to be both credible and reliable.  Dr. O'Brien concluded that the defendant was under an abnormally elevated stress level at

the time he was interviewed by the agents at UMC, that the stress level was caused in part

by deprivations of the medicines he needed to treat his hemophilic condition, as well as

the deprivation of the pain medicine to deal with the pain resulting from his condition.

Tr. June 11, 2014 at 97:17-23.  He said the defendant's situation was exacerbated further

by his lack of food and sleep in the preceding 24 to 48 hours.  *Id.* at 32:11-19.  And

because of all of this, in his opinion, the defendant had an abnormally elevated stress

level and was not able to appreciate the gravity of the circumstances, nor was he aware of

his ability to decline to be interviewed by the Secret Service agents.  *Id.* at 45:18-46:9.

Of course, at that point in time, the defendant had not even yet been given a basic

psychiatric evaluation, let alone any treatment, and was still dealing with his painful

physical disability.  Indeed, in Dr. O'Brien's expert opinion, the defendant was an

individual who perceived these agents as people who would help him get out of the

hospital, *id.* at 45:3-23, and was significantly vulnerable to being seduced into speaking

with them in the hope that they were his ticket out of the hospital.  *Id.* at 45:24-46:7.

Whether he believed that or not, I, of course, have no way of knowing.  There is,

however, no question in my mind that the agents never did anything to dispel any belief

Hallford may have had that the interview was required, and that if he was going to leave

that hospital, he would need their blessing.  Indeed, under the totality of the

circumstances, the defendant undoubtedly did not ever understand that he had the choice

to not speak with these agents.  His physical and mental condition combined had clearly

sapped his ability to discern the seriousness of the situation.  *See United States v. Preston*,

751 F.3d 1008, 1020 (9th Cir. 2014) (focusing on defendant's "reduced mental capacity"

as a "critical factor because it may render him more susceptible to subtle forms of coercion"); *United States v. Sablotny*, 21 F.3d 747, 752 (7th Cir. 1994) ("If mental impairment of whatever kind should have reasonably been apparent to the interrogators, special care should have been exercised, and a lesser quantum of coercion would render the confession involuntary."). Thus, the Government has failed to demonstrate by a preponderance of the evidence the voluntariness of his statements, and the Court finds that the defendant's will was overborne by the totality of the circumstances.

## CONCLUSION

Few people are more vulnerable to be taken advantage of than those simultaneously suffering from both a serious physical and mental illness. Fewer still are those who have also been committed to a mental institution against their will. Agents of the U.S. Government who seek to interview such patients should make every effort to determine the state of their physical and mental capacity *before* conducting an interview with them that might be either unproductive, or worse, Constitutionally improper. This, of course, is especially true when there is *no* exigency or need whatsoever to engage in such questioning *prior* to their receiving the treatment necessary to enable them to regain their physical and mental stability. Sadly, the agents here were not only indifferent to the defendant's physical and mental condition, but sought to take advantage of it in the hope it would result in an incriminating admission. Hopefully granting these motions *after* the

defendant has already spent a year in custody will put an end to this most recent chapter of questionable conduct by agents of our Secret Service.

RICHARD J. LEON
United States District Judge