# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal Case No. 13-335 (RJL) |
| | ) | |
| JOSEPH DANIEL HALLFORD, | ) | **FILED** |
| | ) | |
| Defendant. | ) | NOV 2 0 2017 |

**FILED**

NOV 2 0 2017

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

## MEMORANDUM OPINION
(November 20, 2017) [Dkt. # 50]

On November 6, 2013, defendant Joseph Daniel Hallford ("Hallford" or "defendant") was questioned by United States Secret Service agents while involuntarily committed to a local psychiatric hospital. The agents questioned Hallford, an Alabama resident, in response to statements he made regarding the Secret Service while visiting Washington, D.C. to attend a protest march. During the course of the questioning, the Secret Service agents elicited incriminating statements from Hallford regarding his unlawful possession of firearms and other weapons in the District.

Hallford asks this Court to suppress those statements, arguing that they were obtained in violation of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). *See* Def.'s Mot. Suppress Statements [Dkt. # 50]. It is undisputed that the Secret Service agents failed to inform Hallford of his *Miranda* rights. Therefore, the only issue this Court must resolve is whether Hallford was in custody while questioned. If so, then Hallford was entitled to *Miranda* warnings and the agents' failure to provide those warnings mandates suppression of the statements; if not, then Hallford was not entitled to protection under *Miranda* and the statements were obtained lawfully. Upon consideration of the entire

evidentiary record, including testimony from Hallford, the parties' briefing and supplemental briefing, the oral arguments held on this issue, and the relevant law, the Court concludes that the defendant was in *Miranda* custody when questioned by the Secret Service agents on November 6, 2013. The Court therefore GRANTS Hallford's motion to suppress.

## BACKGROUND

The facts at issue here – which center around the Secret Service's questioning of an individual both mentally and physically ill during his involuntary commitment at a local psychiatric hospital – are as troubling as they are unique. Before laying out those facts, however, it is helpful to review the procedural history and present posture of this case.[1]

As discussed in more detail below, on November 6, 2013, two agents of the United States Secret Service traveled to a local psychiatric hospital, United Medical Center ("UMC"), in order to question Hallford. *United States v. Hallford*, 816 F.3d 850, 853 (D.C. Cir. 2016) ("*Hallford I*"). At the time, Hallford, an Alabama resident who was visiting Washington, D.C. for a protest march, was involuntarily committed to UMC. *Id.* at 852-53. The Secret Service agents sought to question Hallford about statements that he had made that were "causing concern with the Secret Service." 6/5/14 Hr'g Tr. 51:12-13. At some point during the questioning, the focus shifted from Hallford's statements (which, by that time, the agents had determined were harmless) to his weapon ownership. *Id.* at 65:13-17, 101:5-18. Ultimately, the agents elicited incriminating admissions from Hallford

---

[1] For a fuller description of the factual background, see *United States v. Hallford*, 103 F. Supp. 3d 1 (D.D.C. 2015), my prior opinion in this case.

regarding his unlawful possession of firearms and other weapons in the trunk of the car he had parked in the District of Columbia. *See id.* at 69:22-70:2; *Hallford I*, 816 F.3d at 854. Those admissions were subsequently used to gather evidence and commence a criminal prosecution against Hallford. *Hallford I*, 816 F.3d at 854-55.

Defendant moved to suppress his statements from the November 6, 2013 interview. *See generally* Def.'s Mot. Suppress Statements Taken in Violation of the U.S. Constitution 2-4 [Dkt. # 10]. He argued, as relevant here, that the statements were non-voluntary and obtained in violation of his rights under *Miranda*. *Id.* This Court held evidentiary hearings over the course of three days to consider those issues. Ultimately, after considering the evidence and evaluating the credibility of the witnesses, I agreed with Hallford that his November 6, 2013 statements were involuntarily made and elicited in violation of *Miranda*. I therefore granted Hallford's suppression motion. *See* 12/16/14 Hr'g Tr. 2-14 [Dkt. # 26]; *United States v. Hallford*, 103 F. Supp. 3d 1 (D.D.C. 2015).

The Government, not surprisingly, appealed my decision and, following briefing and oral argument, our Circuit issued its opinion. *See Hallford I*, 816 F.3d 850. In that opinion, our Circuit first concluded that Hallford's statements were not the product of "a substantial element of coercive police conduct" and were therefore "voluntary within the meaning of the Due Process Clause." *Id.* at 858, 859 (internal quotation marks omitted). In the course of its analysis, the majority cast aside a few of my factual findings—findings that were made following my observation of witness testimony at the evidentiary hearings. *See id.* at 857-59. Of particular relevance here, the majority rejected my conclusion that Hallford "was summoned by agents for an interview, not asked if he would submit to an

interview." *Id.* at 857 (internal quotation marks omitted). Judge Wilkins dissented from that portion of the opinion, writing that the majority's "focus solely on the evidence that undermines the District Court's factual findings represents, in my respectful view, its failure to adhere to the deferential standard of review we employ when evaluating a District Court's factual findings." *Id.* at 860-62 (Wilkins, J., dissenting in part and concurring in part).

As for the *Miranda* issue, our Circuit held that the record was not "sufficient" to decide whether Hallford was entitled to receive *Miranda* warnings. *Id.* at 859. Recognizing that the *Miranda*-custody inquiry is "fact intensive," the Circuit vacated my decision and remanded the case to me "to determine whether Hallford was in *Miranda* custody." *Id.* (internal quotation marks omitted). It directed me to "take care to answer" the question whether Hallford's environment "presented the same inherently coercive pressures as the type of station house questioning at issue in *Miranda.*" *Id.* at 860 (internal quotation marks and alteration omitted) (quoting *Howes v. Fields*, 565 U.S. 499, 509 (2012)).

In light of the remand and our Circuit's concern that the record as it stood was insufficient to decide the *Miranda*-custody issue, I held an additional evidentiary hearing and oral arguments on the subject. At the evidentiary hearing, Hallford testified—credibly, in my judgment—about the events surrounding his November 6, 2013 questioning by the Secret Service agents. *See generally* 5/22/17 Hr'g Tr. [Dkt. # 59]. Some of defendant's testimony was consistent with the evidentiary record as reviewed by our Circuit in *Hallford I*; some of it was not. Other testimony, including, most critically,

testimony regarding what Hallford was told by UMC staff prior to being escorted to the Secret Service interview, provided new facts not examined by our Circuit.[2]

For present purposes, I need not recount the entirety of the factual background, which was set out by our Circuit in *Hallford I*. *See* 816 F.3d at 852-54. Instead, I will begin discussion of my factual findings on remand with Hallford's arrival at George Washington University Hospital ("GW Hospital") on November 5, 2013. When Hallford arrived at GW Hospital, he complained of pain, bleeding, and related symptoms as a result of his hemophilia. *Id.* at 853. In the course of waiting for treatment, Hallford made a number of troubling statements to hospital personnel, including statements that he wanted "to be shot by the Secret Service . . . so his parents could own the agency" and desired to "hurt the government." *Id.* (internal quotation marks omitted).

In light of Hallford's actions at GW Hospital and his apparently unstable mental condition, hospital personnel decided to transfer Hallford to UMC for an "involuntary

---

[2] This brings me to an important threshold point regarding the effect of our Circuit's decision in *Hallford I*. As discussed, the *Hallford I* decision vacated my previous *Miranda* holding. *See* 816 F.3d at 859-60. That vacatur "clear[ed] the path for future relitigation of the issue[] between the parties." *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 22 (1994) (internal quotation marks omitted). Importantly, the Circuit panel remanded the case because, in its estimation, the record as it stood was not "sufficient" to make a custody determination. *Hallford I*, 816 F.3d at 859.

In response to the Circuit's remand and in light of its concern regarding the sufficiency of the record, I held an additional evidentiary hearing, took new testimony, and requested supplemental briefing from both sides. Although the Government argues that this Court remains bound by many of the *Hallford I* Court's factual findings, it concedes that I "must consider all of the evidence presented" on remand, "including the defendant's testimony" at the 2017 evidentiary hearing. U.S.'s Suppl. Mem. Opp'n Mot. Suppress Statements ("U.S.'s Suppl. Mem.") 11 [Dkt. # 66]. Thus, when it comes to the custody determination I must now make, there is additional evidence to consider and competing credibility determinations to render. Having carefully examined the entire evidentiary record and supplemental filings, I conclude that it is necessary to "revisit[]" a few of the factual assertions made by our Circuit in its *Hallford I* opinion. *United States ex rel. Oliver v. Philip Morris USA, Inc.*, 101 F. Supp. 3d 111, 119-120 & n.5 (D.D.C. 2015) ("[I]t is widely acknowledged that where new evidence is available, revisiting the law of the case is proper." (internal quotation marks omitted)). For clarity, I will note those facts as they are discussed.

psych evaluation." *Id.* (citing D.C. CODE §§ 21-521 to -522). According to Hallford, he was informed by an individual at GW Hospital that "they were having [him] evaluated and that [he] would be transferred to another hospital." 5/22/17 Hr'g Tr. at 5:25-6:1. When Hallford responded that he did not "want to do that" and "just want[ed] to go home," the individual informed Hallford that GW Hospital had a "court order" to hold him involuntarily. *Id.* at 6:4-6. The individual also informed Hallford that the basis of the involuntarily commitment was "some comment" or "comments" made by Hallford; the individual did not "elaborate" on that explanation. *Id.* at 16:18-19.

Hallford was transferred by ambulance from GW Hospital to UMC at approximately 3 P.M. on November 6, 2013. *Hallford I*, 816 F.3d at 853. During the transfer, Hallford was put on a gurney and "strapped down" by his arms and legs. 5/22/17 Hr'g Tr. 6:12-13. Upon arrival at UMC, Hallford was immediately forced to surrender to UMC staff "everything that [he] had on [him]," including his wallet, cell phone, keys, clothes, and shoes. *Id.* at 6:25-7:7. UMC personnel directed Hallford to change into an open-backed hospital gown and did not provide him with any "underwear to put on underneath." *Id.* at 7:12-14. Hallford was then brought to a hospital room.

Shortly after his arrival at the hospital room, Hallford heard a knock outside his door. *Id.* at 8:6-7. He turned and saw three members of the UMC staff, two of whom were nurses. *Id.* at 8:15-17, 38:11-23. One of the nurses told Hallford that he "needed to come with them." *Id.* at 8:8-9. When Hallford asked why, the nurse responded "that the Secret Service and the FBI were there to talk to" Hallford, and that he "had to go talk to them." *Id.* at 8:9-11. When Hallford asked whether he had to go "talk to them right now," the

nurse responded, "yes." *Id.* at 8:19-23. Upon hearing that, Hallford asked whether he could "have [his] lawyer" if he was "going to be questioned." *Id.* at 9:1-3. The nurse responded that he could not have a lawyer, but that he would "get one" whenever he went "to court about the involuntary commitment order." *Id.* at 9:7-11.

Next, Hallford, wearing only his hospital gown, was escorted by the three UMC staff members down a hallway. *Id.* at 10:4-8. Up ahead, Hallford saw the two Secret Service agents. *Id.* at 10:7-8. The groups converged and went into a doctor's lounge. That area locked from both the inside and the outside and was accessible only with a keycard. 6/5/14 Hr'g Tr. 140:8-20. Once the group had entered the secure doctor's lounge, the agents informed Hallford that they were from the Secret Service. 5/22/17 Hr'g Tr. 10:15-15. They asked Hallford to confirm his identity. *Id.* at 10:14-17. Defendant did so, and then immediately asked whether he was in "in trouble." *Id.* According to Hallford, one of the agents responded, "'Not unless you've done something wrong' or 'have you done something wrong?'" *Id.* at 35:6-8. When defendant said that he had not, the agent simply "shrugged his shoulder[s]" and gestured with his hands. *Id.* at 35:8-10.[3]

Depending on the account, prior to questioning Hallford, the agents either 1) "asked" Hallford if they could speak to him about, or 2) "told" Hallford that "they had

---

[3] Hallford's testimony differs from that of Agent Fox, the Secret Service agent who testified at the prior evidentiary hearing, in two ways. In testimony cited by our Circuit in *Hallford I*, Agent Fox stated that, prior to the agents' questioning, Hallford asked whether he was under arrest and whether he was in trouble, to which the agents responded "no." 6/5/14 Hr'g Tr. 51:6-9; *see Hallford I*, 816 F.3d at 853. But when Hallford testified, he denied ever asking whether he was under arrest. 5/22/17 Hr'g Tr. 35:3-4. Hallford's testimony also indicates that the agent equivocated—rather than straightforwardly answered "no"—when Hallford asked whether he was in trouble. *Id.* at 35:6-9. To the extent the two accounts conflict, I find, after observation of both men on the witness stand and consideration of their accounts as a whole, that Hallford's testimony is to be credited over Agent Fox's.

some questions with regard" to statements that he had made "that may have caused some concern to the Secret Service." *Hallford I*, 816 F.3d at 853; 5/22/17 Hr'g Tr. 35:11-16. In any event, Hallford began to speak with the agents. *Hallford I*, 816 F.3d at 853. When asked why he spoke with them, Hallford testified at the evidentiary hearing that he did not think that he had "any choice about whether to talk to the Secret Service." 5/22/17 Hr'g Tr. 11:12-14. He further noted that he "figured that if [he] didn't talk to them that [he] probably would be in trouble if [he] wasn't already." *Id.* at 11:16-17. In Hallford's words, he "figured that" the Secret Service agents "weren't going to let [him] go if [he] didn't cooperate" and that if he did cooperate, the Secret Service would see "that I wasn't no threat to nobody and I wasn't—do[ing] nothing wrong that I knew of, I figured they'd tell them, well, we ain't got no use for him, send him home." *Id.* at 11:16-19, 12:5-8.[4]

At no point prior to or during the interview did the agents inform Hallford of his *Miranda* rights. *Hallford I*, 816 F.3d at 852. Nor did they ever inform defendant that he was free to decline to participate in the interview or go back to his room at any point. 6/5/14 Hr'g Tr. 159:22-160:8. During the interview, defendant was seated on "the far side" of a table in the doctor's lounge in a "plastic chair." 5/22/17 Hr'g Tr. 11:6-10. According to the Secret Service's notes about the interview, Hallford was "shivering and appeared extremely tired." 6/5/14 Hr'g Tr. 146:5-7. Although the agents spoke in conversational

---

[4] Hallford's testimony aligns with opinions previously provided in an expert report authored by Dr. John O'Brien, a specialist in the field of forensic psychiatry. *See Hallford I*, 816 F.3d at 862 (Wilkins, J., dissenting in part and concurring in part) (reciting testimony and findings). It also contradicts the *Hallford I* majority's previous conclusion that "[a]ll indications are that Hallford perceived [his] detention as imposed only for purposes of a medical examination." *Id.* at 859 n.12 (internal quotation marks and alteration omitted).

tones during the interview, *Hallford I*, 816 F.3d at 854, Hallford observed that one of the agents was armed (in fact, both were), 5/22/17 Hr'g Tr. 32:7; *see* 6/5/14 Hr'g Tr. 136:10-13. One of the agents took a photograph of Hallford—who was then wearing nothing but his open-backed hospital gown—without his permission. 6/5/14 Hr'g Tr. 150:23-151:6.

During their questioning, which lasted around one hour, the agents asked Hallford about "concern[ing]" statements he had made regarding the Secret Service. *Id.* at 51:12. Notwithstanding their conclusion that the statements were harmless, they also asked Hallford questions about his weapon ownership in Alabama. *Hallford I*, 816 F.3d at 854-55. In response to those questions, Hallford made the incriminating statements now at issue. *Id.* Those admissions were subsequently used to gather evidence and commence a criminal prosecution against defendant. *Id.*

In the motion presently before me, defendant contends that he was in custody at the time of the November 6, 2013 Secret Service interview at UMC and was thus entitled to be informed of his *Miranda* rights prior to the agents' questioning. *See generally* Def.'s Mot. Suppress Statements. Because he was not so informed, Hallford argues that his statements to the Secret Service agents must be suppressed. *Id.* For the following reasons, I agree.

## ANALYSIS

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. That privilege against self-incrimination is "fundamental to our system of constitutional rule" and "one of the principles of a free government." *Miranda*, 384 U.S. at 468; *Malloy v. Hogan*, 378

9

U.S. 1, 9 (1964) (internal quotation marks omitted). It protects not only those statements made during court proceedings, but also, as the Supreme Court held in *Miranda*, statements made during a "custodial interrogation" by law enforcement. *Miranda*, 384 U.S. at 444.

The *Miranda* Court recognized that the "inherently compelling pressures" of custodial interrogation could work to "compel" a suspect "to speak where he would not otherwise do so freely." *Id.* at 467. To "safeguard the uncounseled individual's Fifth Amendment privilege" in the face of those pressures, the *Miranda* Court adopted a set of "prophylactic measures" that apply whenever an individual is interrogated while in "police custody." *J.D.B. v. North Carolina*, 564 U.S. 261, 269 (2011) (alteration omitted); *Thompson v. Keohane*, 516 U.S. 99, 107 (1995). Those measures include the requirement that investigators make a suspect aware of his various rights under the Constitution, including the right to remain silent and the right to consult with a lawyer prior to and during questioning. *See Miranda*, 384 U.S. at 467-69, 472-73.

All agree that the Secret Service agents failed to inform Hallford of his *Miranda* rights. Therefore, the sole legal dispute remaining is whether Hallford was "in custody" at the time of the agents' questioning. *Thompson*, 516 U.S. at 102 (internal quotation marks omitted). If the answer to that question is no, then Hallford was not entitled to *Miranda* warnings and the Government may offer the statements during its case in chief against Hallford. *See United States v. Murdock*, 667 F.3d 1302, 1305 (D.C. Cir. 2012). If the

answer is yes, then the statements were obtained in violation of the Constitution and are inadmissible as part of the Government's case in chief. *Id.*[5]

As used in the *Miranda* case law, "'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes*, 565 U.S. at 508-09; *see also Miranda*, 384 U.S. at 444 (custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way"). When identifying those circumstances in a particular case, a court must make "any number of fact-intensive, close calls," many implicating "the trial court's superior capacity to resolve credibility issues." *Hallford I*, 816 F.3d at 859-60 (internal quotation marks omitted) (quoting *Thompson*, 516 U.S. at 118 (Thomas, J., dissenting)); *Thompson*, 516 U.S. at 113.

To help guide courts in the *Miranda*-custody inquiry, the Supreme Court has set forth a two-step analysis for use in determining whether the interrogation at issue was custodial. First, courts are "to ascertain whether, in light of the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *Howes*, 565 U.S. at 509 (internal quotation marks, alteration, and citation omitted). If a court concludes that a reasonable person would not have felt at liberty to terminate the interrogation, it must then address "whether the relevant

---

[5] Our Circuit has already concluded that Hallford's statements were voluntary. *See Hallford I*, 816 F.3d at 859. But as the Supreme Court has recognized, "*Miranda*'s procedural safeguards exist precisely because the voluntariness test is an inadequate barrier when custodial interrogation is at stake." *J.D.B.*, 564 U.S. at 281. I therefore must address the *Miranda* issue on its own terms.

environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.*

Applying that two-step analysis, I conclude that defendant was in custody for purposes of *Miranda* when he was questioned by the Secret Service agents at UMC.[6]

## A. A Reasonable Person in Hallford's Position Would Not Have Felt at Liberty to Terminate the Secret Service Interrogation and Leave

The Supreme Court has identified a number of factors for use by courts when considering whether a reasonable person subjected to questioning would have felt "at liberty to terminate the interrogation and leave." *Howes*, 565 U.S. at 509 (internal quotation marks omitted). To start, the "language that is used in summoning" an individual to an interview is an important factor. *Id.* at 514. A finding of *Miranda* custody is more likely, for example, when the questioned individual did not "come voluntarily" or otherwise "invite" or "consent" to the interview at issue. *Yarborough v. Alvarado*, 541 U.S. 652, 661 (2004) (citing *Oregon v. Mathiason*, 429 U.S. 492, 495 (1997) (per curiam)); *Howes*, 565 U.S. at 515; *see also Yarborough*, 541 U.S. at 665 (*Miranda* custody argument supported by fact that questioned individual "was brought to the police station by his legal guardians rather than arriving on his own accord, making the extent of his control over his presence unclear").

---

[6] The parties dispute whether the burden on the *Miranda*-custody issue falls with Hallford or the Government. I need not take a position on that issue. That is because, even assuming the burden is Hallford's, I conclude for the reasons discussed below that he has met his burden of showing that the Secret Service interview was "custodial" under *Miranda*.

The location, duration, and manner of the agents' questioning are also relevant factors for purposes of the custody determination. *Howes*, 565 U.S. at 509 (collecting cases). So is "the presence or absence of physical restraints" on the suspect during the questioning. *Id.* As a general matter, an interrogation is more likely to be "custodial" when the questioning is isolated, lengthy, or aggressive, and the questioning officers are armed. *See, e.g.*, *Howes*, 565 U.S. at 515 (fact that interview lasted "between five and seven hours" and "deputies who questioned" suspect "were armed" lent support to *Miranda* custody argument); *Berkemer v. McCarty*, 468 U.S. 420, 437 (1984) (traffic stops not "custodial" for purposes of *Miranda* because they are "presumptively temporary and brief" and are public).

"[S]tatements made during the interview" also weigh in the custody analysis. *Howes*, 565 U.S. at 509. In *Howes*, for instance, the Supreme Court characterized an investigating officer's statement to the interviewee "that he was free to end the questioning" as an "especially" important factor weighing against a custody finding; by contrast, the fact that the interviewee "was not advised that he was free to decline to speak with the deputies" lent support to his "argument that *Miranda*'s custody requirement was met." *Id.* at 515, 517; *see United States v. Baird*, 851 F.2d 376, 381-82 (D.C. Cir. 1988) (questioning agent's "clear statement" to suspect that suspect "could leave at any time" weighed against custody finding).

On a similar note, courts may also consider whether the officers informed the questioned individual of his arrest status or his status as the target of investigation. *Compare Yarborough*, 541 U.S. at 661 (individual was not in custody in part because he

was told that he was "not under arrest" during interview), *with Stansbury v. California*, 511 U.S. 318, 325 (1994) (per curiam) (an officer's "knowledge or beliefs" that the individual being questioned is a suspect or the focus of investigation "may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned").

Finally, whether a suspect was released following questioning also bears on the custody inquiry. *See, e.g., Yarborough*, 541 U.S. at 664 (fact that suspect "went home" at "the end of the interview" weighed against custody finding); *Mathiason*, 429 U.S. at 495 (defendant not in custody at time of questioning in part because "[a]t the close of a ½-hour interview respondent did in fact leave the police station without hindrance").

It is important to note that none of the above factors is dispositive. Rather, when determining whether a reasonable person would have felt free to terminate the interrogation and leave, courts must "'examine all of the circumstances surrounding the interrogation.'" *J.D.B.*, 564 U.S. at 270-71 (quoting *Stansbury*, 511 U.S. at 322). Examining all of the circumstances of this case, I easily conclude that a reasonable person in Hallford's position would not have felt free to terminate the Secret Service interrogation and leave. How so?

To begin with, it is beyond dispute that Hallford did not arrive at the Secret Service interview "voluntarily." *Yarborough*, 541 U.S. at 661. To state the obvious, Hallford had been *involuntarily* committed to a hospital in an unfamiliar city. That alone is likely enough to satisfy the "freedom of action" inquiry. *Cf. Maryland v. Shatzer*, 559 U.S. 98, 112 (2010) ("restraint on freedom of movement" test, "no doubt, is satisfied by all forms of incarceration" (internal quotation marks omitted)); *North Carolina v. Hammonds*, 804 S.E.2d 438, 442 (N.C. 2017) (When "a suspect's freedom of movement is already restricted

14

because of conditions unrelated to the interrogation," courts move to the second step of the *Howes* analysis.).

But here, there's more. Not only was Hallford interviewed at a facility where he was being "held against [his] will," 6/5/14 Hr'g Tr. 187:15, he was informed by the facility's staff that his presence at the *interview* was itself *mandatory*. Accordingly he was "brought to" the separate interview location "rather than arriving on his own accord." *Yarborough*, 541 U.S. at 665. In testimony that the Government has not rebutted, Hallford stated that he was approached by three UMC employees and told that he "needed to come with them" because "the Secret Service and the FBI were there to talk to" him and he "had to go." 5/22/17 Hr'g Tr. 8:7-11. When Hallford asked whether he had "to talk to them right now," he was told "yes." *Id.* at 8:22-23; *see also id.* at 8:24-25 ("Q: Did she say whether you had any choice or not? A: No. She said I had to go."). Defendant responded by asking whether he could have a lawyer if he was going to be questioned. *Id.* at 9:1-3. He was told that he could not have a lawyer, but instead would "get one" when he appeared in court "about the involuntary commitment order." *Id.* at 9:9-11.[7]

---

[7] The Government casts aspersions on the reliability of Hallford's testimony. It notes, for example, that the day after his "purported" conversation with the UMC nurse, Hallford was diagnosed "with 'schizoaffective disorder' because he was experiencing 'mood instability' and 'paranoid delusions' about the government." U.S.'s Mem. Resp. Def.'s Suppl. Mot. Suppress Statements ("U.S.'s Mem. Resp.") 4 (alteration omitted) [Dkt. # 61]. That argument is jaw-dropping, given the great lengths to which the Government previously went to characterize Hallford as "calm," "low-key," and "maintain[ing] a normal conversation, displaying no confusion or cognitive symptoms" during the interview. *Hallford I*, 816 F.3d 850, U.S. Br. 46, 47. In other words, the Government asserted that Hallford was calm and coherent when it was expedient for their voluntariness argument, but is now claiming the opposite in an effort to discredit his testimony on the *Miranda*-custody issue. Flip-flops of this magnitude are disingenuous at best. In any event, having observed Hallford's testimony firsthand, I "resolve" the "credibility issues" in this case in favor of Hallford. *Thompson*, 516 U.S. at 113.

Hallford's testimony is important for a number of reasons. To begin, it provides new evidence, not yet passed on by our Circuit, that Hallford was indeed "summoned by agents" to the interview room—not asked if he would voluntarily attend the interview. *Hallford I*, 816 F.3d at 857 (internal quotation marks omitted). The fact that UMC staff believed that Hallford "had to go" speak with the agents simply cannot be squared with the Government's assertion—seemingly accepted by our Circuit in *Hallford I*—that the Secret Service sought UMC's (much less Hallford's) permission to take Hallford to the separate interview location. *Id.*

In addition, Hallford's testimony provides additional context to help determine whether a reasonable person in Hallford's situation would have felt at liberty to decline or terminate the Secret Service interview. The Government contends, and I will accept solely for the sake of argument, that Secret Service Agent Fox "asked" defendant if the agents "could speak to him" once he had been brought by UMC staff to the interview room involuntarily. 6/5/14 Hr'g Tr. 138:23.[8] The Government emphasizes that exchange, arguing that it all but forecloses a finding of *Miranda* custody. *See, e.g.*, U.S.'s Mem. Resp. 5-6. Placed in context, however, defendant's response to the agents' "request" does not bear the weight the Government seeks to place on it: Having just been informed that the interview was mandatory—and having been brought to the interview by UMC staff

---

[8] I say solely for the sake of argument because Agent Fox's testimony about their "request" to speak with Hallford is far from clear. *Compare* 6/5/14 Hr'g Tr. 52:14-15 (stating that agents informed Hallford "we would like to, you know, talk to you"), *and id.* at 160:18-19 (noting that agents typically say "we are with the Secret Service; we would like to talk to you"), *with id.* at 54:8-9 (stating that agents said "can we speak with you about those statements?"), *and id.* at 161:2-3 ("I asked Mr. Hallford if he would like to speak with us.").

16

apparently acting pursuant to the direction of the Secret Service—it is unlikely, to say the least, that a reasonable person in Hallford's position would have understood the agents' words as rendering the interview itself optional rather than as a pro forma segue into their questioning.

That conclusion is bolstered by the fact that the agents "never told" Hallford that "he had the right to say no" to or otherwise leave the interview—an important fact lending additional support to a custody finding. 6/5/14 Hr'g Tr. 138:25, 159:22-160:8; *cf. Howes*, 565 U.S. at 515.[9] Moreover, not only did the agents neglect to inform Hallford that "he was free to end the questioning," *Howes*, 565 U.S. at 517, the agents also equivocated when defendant asked whether he was "in trouble." *See* 5/22/17 Hr'g Tr. 35:3-9. The agents' failure to inform Hallford of his freedom to end the interview, and their implicit suggestion that he could be "in trouble" depending upon his actions, both counsel in favor of a custody finding. *Cf. Howes*, 565 U.S. at 515 (officer's statement to interview subject "that he could leave and go back to his cell whenever he wanted" was the "[m]ost important" fact

---

[9] The Government asserts that "Hallford was free to decline to participate in the interview," while at the same time acknowledging that "the agents did not tell him that." U.S.'s Mem. Opp'n Def.'s Mot. Suppress Statements 7 [Dkt. # 52]. The Supreme Court time and again, however, has instructed that a law enforcement agent's "unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time." *Berkemer*, 468 U.S. at 442; *see also Stansbury*, 511 U.S. at 324 ("[O]ne cannot expect the person under interrogation to probe the officer's innermost thoughts."). Therefore, given that Hallford was never informed of his alleged ability to "decline to participate" in the interview, the Government's post hoc assertions have no place in my analysis. Nor does Hallford's "prior history with law enforcement." *Yarborough*, 541 U.S. at 668.

In arguing against custody, the Government also emphasizes that, towards the end of the interview, Hallford denied the agents' requests to search his car. According to the Government, Hallford's refusal shows that he also felt free to decline the officers' questioning. *See* U.S.'s Suppl. Mem. 3-4. The testimony on that score, however, indicates that Hallford denied the particular request to search the car in large part because the car was his father's, not because he believed the entire interview was voluntary. *See* 5/22/17 Hr'g Tr. 31:10-12.

supporting conclusion that subject was not in *Miranda* custody); *Yarborough*, 541 U.S. at 664 (no *Miranda* custody in part because officer did not "suggest [interviewee] would be placed under arrest" based on interview statements). In addition, the agents photographed Hallford, then wearing nothing (i.e., not even underwear) but his open-backed hospital gown, without asking his permission—yet another fact indicating that a reasonable person would not have felt sufficiently in "control" to terminate the interview. *Yarborough*, 541 U.S. at 665.

Other characteristics of the Secret Service agents' questioning support the conclusion that it was custodial. Hallford was led to the interview room surrounded by a phalanx of three UMC staff members. *See* 5/22/17 Hr'g Tr. 10:4-8. Although not physically restrained, Hallford clearly was *not* at liberty to leave the interrogation on his own accord: The door to access the interview location locked from both the outside and the inside, rendering his exit impossible without the permission of someone possessing a keycard. *See* 6/5/14 Hr'g Tr. 140:17-20. The questioning officers "were armed." *Howes*, 565 U.S. at 515. And Hallford was far from "[]comfortable." *Cf. id.* Indeed, the record shows that defendant, who was seated in a plastic chair wearing nothing but his open-backed hospital gown, was "shivering and appeared extremely tired" during the interview. 6/5/14 Hr'g Tr. 146:5-6. Following the interview, Hallford was not free to leave "without hindrance," *Mathiason*, 429 U.S. at 495; instead, he continued to be held against his will at UMC, where he was arrested by agents two days later.

To be sure, there are a few facts that somewhat cut against a custody finding. For example, the interview occurred in a hospital, rather than a police station. *But see, e.g.,*

*South Dakota v. Long*, 465 F.2d 65, 69-70 (8th Cir. 1972) ("The Supreme Court has held, of course, that a custodial situation need not be strictly limited to a police station."). The hour-long interview is shorter than other examples in the case law, including the interview in *Howes*. *But see, e.g.*, *United States v. Craighead*, 539 F.3d 1073, 1078 (9th Cir. 2008) (*Miranda* custody established where interview lasted twenty to thirty minutes). Individuals other than the police were present in the room where the interview took place, and the door to the room was open at least some of the time. *But see, e.g.*, *Reinert v. Larkins*, 379 F.3d 76, 79, 87 (3d Cir. 2004) (*Miranda* custody established where defendant made statement in ambulance to law enforcement officer with emergency medical technician present); *Long*, 465 F.2d at 68 (*Miranda* custody established where suspect was questioned in room where "door was closed," but "people kept opening it"). The agents did not resort to "sharp tones" with Hallford as they drew out incriminating information. *But see, e.g.*, *United States v. Borostowski*, 775 F.3d 851, 862 (7th Cir. 2014) (*Miranda* custody established where tone of interview "never became hostile or combative"). And the defendant was offered food by a doctor after that doctor overheard Hallford say that he had "not eaten" for a "couple of days." 6/5/14 Hr'g Tr. 81:19-25, 147:15-16. *But see, e.g.*, *Hammonds*, 804 S.E.2d at 443 (*Miranda* custody established where "detectives offered food or drink" to suspect after interview).

As a survey of the case law makes clear, however, none of those mitigating facts controls the analysis. Instead, they all must be weighed as part of the *Miranda*-custody totality of the circumstances inquiry. When so weighed, in my judgment, those mitigating facts do not overcome all of the "features of the interrogation" that would have led a

reasonable person in Hallford's position to feel that he "'was not at liberty to terminate the interrogation and leave.'" *Howes*, 565 U.S. at 509, 514 (quoting *Thompson*, 516 U.S. at 112).

## B. The Environment of the Secret Service Interrogation Presented the Same Inherently Coercive Pressures Contemplated by *Miranda*

Having concluded that a reasonable person in Hallford's position would not have felt at liberty to terminate the interrogation and leave, I must now determine whether Hallford's questioning presented "the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Howes*, 565 U.S. at 509; *see Hallford I*, 816 F.3d at 860. As both parties recognize, the Supreme Court's *Howes* case provides guidance to courts making that inquiry. Specifically, in the course of rejecting an argument that imprisonment alone is "enough to create a custodial situation within the meaning of *Miranda*," *Howes*, 565 U.S. at 511, the *Howes* Court identified three coercive pressures that may arise in the typical *Miranda* custodial interrogation. As I will explain, all factors point in favor of a custody finding here.

First, the *Howes* Court noted that "[i]n the paradigmatic *Miranda* situation," where "a person is arrested in his home or on the street and whisked to a police station for questioning," detention "represents a sharp and ominous change, and the shock may give rise to coercive pressures." *Id.* Put differently, because a person subjected to custodial interrogation has been "yanked from familiar surroundings in the outside world" and "'cut off from his normal life and companions,'" the Supreme Court in *Miranda* recognized that the individual may be more likely than the average person to feel coerced into answering

police questions. *Id.* at 511 (quoting *Shatzer*, 559 U.S. at 106). Indeed, as the Supreme Court later observed, many of the questioning techniques discussed by the *Miranda* Court "capitalize on the suspect's unfamiliarity with the officers and the environment." *Minnesota v. Murphy*, 465 U.S. 420, 433 (1984).

Here, there is no debate that, at the time of his questioning, defendant had been "yanked from familiar surroundings in the outside world" and "cut off from his normal life and companions." *Howes*, 565 U.S. at 511 (internal quotation marks omitted). At the time of his involuntary commitment, Hallford was hundreds of miles from home in an unfamiliar city. He had just suffered a serious and painful medical episode that required immediate attention at a hospital. After arriving at the hospital and displaying signs of mental instability, he was involuntarily committed to the hospital and told that he could not go home. *See* 5/22/17 Hr'g Tr. 6:4-6. He was then "strapped down" on a gurney and transferred to yet another hospital, where he was stripped of his clothing and forced to forfeit all of his property, including his cell phone (leaving him "incommunicado," *Miranda*, 384 U.S. at 445). 5/22/17 Hr'g Tr. at 6:12, 6:25-7:4. Shortly thereafter, he was told that Secret Service agents were there to question him, and that he "had to go talk to them." *Id.* at 8:9-11. His pre-interview request for an attorney was denied. *Id.* at 9:1-3. If those circumstances do not constitute a "sharp and ominous change" to Hallford, the "shock" from which "may give rise to coercive pressures," *Howes*, 565 U.S. at 511, I am at a loss to think what circumstances would.

The second and third *Howes* factors, which are related, are also met here. When discussing the coercive pressures at issue in *Miranda*, the *Howes* Court noted that "[w]hen

21

a person is arrested and taken to a station house for interrogation, the person who is questioned may be pressured to speak by the hope that, after doing so, he will be allowed to leave and go home." *Id.* The Court similarly stated that custodial interrogation threatens to coerce a suspect to speak out of "'fear of reprisal for remaining silent or in the hope of a more lenient treatment should he confess.'" *Id.* at 512 (alteration omitted) (quoting *Illinois v. Perkins*, 496 U.S. 292, 296-97 (1990)). Putting those two concepts together, *Miranda* acknowledges the danger that a suspect's belief that questioners control his fate could coerce him to speak in order to gain favor or avoid punishment. *Cf. Perkins*, 496 U.S. at 297.

There is no question that Hallford believed the Secret Service had control over his situation: He said so ! *See* 5/22/17 Hr'g Tr. 11:16-19 ("And [I] figured that they weren't going to let me go if I didn't cooperate."); *see also id.* at 12:5-8. Even more importantly for purposes of the present inquiry, that belief was objectively reasonable in light of the facts known to the defendant at the time of his questioning. Take first, for example, the circumstances of Hallford's involuntary commitment at GW Hospital and transfer to UMC. Upon his arrival at GW Hospital, Hallford made threatening statements directed at a doctor, the Secret Service, and the Government. The statements regarding the Secret Service were sufficiently troubling that they prompted GW Hospital personnel to contact the Secret Service. *See* 6/5/14 Hr'g Tr. 13:9-13.

Ultimately, GW Hospital personnel decided to involuntarily commit Hallford. When asked what he was informed about the involuntary commitment decision, Hallford testified that he was simply told that he was being committed because of "comments" he

22

had made—a reference that could have only been understood by a reasonable person to include Hallford's prior statements regarding the Secret Service. 5/22/17 Hr'g Tr. 16:18-19. GW Hospital personnel subsequently informed defendant that he was going to be transferred to a different facility, UMC. When he arrived at UMC, he was stripped of all of his belongings, *id.* at 7:1-4, a check-in procedure more often associated with a station house booking than a hospital.

Shortly after his arrival, moreover, Hallford was informed by UMC staff that the Secret Service was there to talk to him. When he asked whether he had to attend, the staff members did not display consideration of his medical needs or otherwise indicate that they were in control of his care. (Indeed, they had not yet even performed a medical evaluation of Hallford. *See* 6/5/14 Hr'g Tr. 94:22-25.) Instead, they told Hallford that he "had to" go speak with the agents. 5/22/17 Hr'g Tr. 8:11. To a reasonable person, that exchange would have created the appearance that the UMC staff members were acting pursuant to the direction of the Secret Service—not the other way around. Finally, when the agents introduced themselves to Hallford, they stated that they wanted to speak with him about "some statements that were made at George Washington Hospital." 6/5/14 Hr'g Tr. 137:10-11. As mentioned previously, Hallford was told that "comments" he made at GW Hospital were the reason for his involuntary commitment. Given all of that, it was objectively reasonable for Hallford to conclude, as he did, that the Secret Service had control over his situation. Because that appearance threatened to heighten the coercive effect of the agents' questioning, the second and third *Howes* factors are satisfied here.

In sum, after considering the unique circumstances of this case against the backdrop of the Supreme Court's decisions in *Howes* and related precedents, I conclude that the Secret Service agents' questioning of defendant during his involuntary commitment at UMC "presented the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Hallford I*, 816 F.3d at 860 (internal quotation marks omitted). Hallford was therefore entitled to receive *Miranda* warnings. Because he did not, his statements must be suppressed as obtained in violation of the Constitution.

## C. The Government's Counterarguments Are Unavailing

The Government presses a few counterarguments in an attempt to avoid the *Miranda*-custody determination warranted by the facts of this case. Those arguments fail.

First, the Government attempts to analogize this case to other cases in which hospitalized individuals were found not to be in *Miranda* custody. But those cases *confirm* rather than contradict my conclusion. Take for example *Reinert v. Larkins*, 379 F.3d 76 (3d Cir. 2004), cited in the *Hallford I* decision. Although the Government—and the *Hallford I* Court—characterize *Reinert* as "holding that a suspect was not in custody even though he was interrogated in an ambulance and was never told that he was free to leave or free not to answer questions," *Hallford I*, 816 F.3d at 860 (internal quotation marks omitted), the *Reinert* court *actually* held precisely the *opposite*. It stated that "with respect to the second statement made in the ambulance to a police officer to whom [the suspect] was 'turned over' by the EMT after his first seemingly incriminating statement, we

conclude that [the suspect] *was in custody* and that his pre-*Miranda* statement should not have been admitted." *Reinert*, 379 F.3d at 79 (emphasis added). Go figure     !

The Government's other cases also fall short, as none involve the situation of an involuntarily committed mental patient being brought against his will from his room to a separate interview location to speak with law enforcement agents investigating the patient's troubling statements. *See, e.g., United States v. Jamison*, 509 F.3d 623, 625, 631 (4th Cir. 2007) (no *Miranda* custody when hospitalized individual "solicited police assistance," thereby "initiating a police investigation"); *United States v. Robertson*, 19 F.3d 1318, 1321 (10th Cir. 1994) (no *Miranda* custody when individual was questioned by police at medical care center in part because individual "was free to check himself out of the care center"); *United States v. Martin*, 781 F.2d 671, 673 (9th Cir. 1985) (no *Miranda* custody when a hospitalized individual "spoke with each of the officers voluntarily, without pressure or coercion," in the confines of his own hospital room).[10]  Notably, the only case from our Circuit presenting a remotely analogous factual situation holds that a patient in a mental health facility *was* entitled to *Miranda* warnings when questioned by police and his doctor regarding his status as a murder suspect. *See United States v. Robinson*, 439 F.2d 553, 660-61 (D.C. Cir. 1970) ("[A]ppellant's position" as mental patient in custody without

---

[10] The most facially similar case this Court could find is *United States v. Parker*, 116 F. Supp. 3d 159 (W.D.N.Y. 2015). In that case, the court concluded that a mental health patient was not in *Miranda* custody when questioned by a Secret Service agent in a hospital conference room. In reaching that conclusion, however, the court emphasized that the agent "informed [the patient] that the interview was voluntary and that he did not have to participate in it and could leave at any time." *Id.* at 171. The court also noted that the interview "room itself was unlocked." *Id.* at 172. Of course, those facts are not true of the questioning at issue in this case.

counsel at psychiatric treatment facility "was even more conducive to compulsion than Miranda's.").

Second, citing the Supreme Court's decision in *Colorado v. Connelly*, 479 U.S. 157 (1986), the Government argues that this Court may not consider any of the coercive attributes of Hallford's questioning that the Secret Service agents did not themselves directly know of or create. Referencing that rule, the Government asks me to turn a blind eye to, among other things, 1) the fact that Hallford was involuntarily committed at a medical facility far from home at the time of his questioning; and 2) the fact that Hallford was told by UMC personnel that his attendance at the Secret Service interview was mandatory and that he could not have a lawyer. *See* U.S.'s Suppl. Mem. 7-9. I can not, in good conscience, do so.

To begin, when deciding if a questioned suspect was in *Miranda* custody, it is relevant whether the suspect was placed in an "inherently coercive situation," even when that "situation was not created by law-enforcement officers." *Wilson v. Coon*, 808 F.2d 688, 689 (8th Cir. 1987). The Government's argument to the contrary ignores that, for purposes of determining *Miranda* custody, the Supreme Court has "required police officers and courts to 'examine *all* of the circumstances surrounding the interrogation.'" *J.D.B.*, 564 U.S. at 270-71 (quoting *Stansbury*, 511 U.S. at 322) (emphasis added). It also flies in the face of recent Supreme Court precedent in this area. In *J.D.B.*, for example, the Supreme Court cited the potentially "coercive effect of the schoolhouse setting"—where a student's presence "is compulsory"—as a factor weighing in favor of evaluating a suspect's

age as part of the *Miranda*-custody inquiry. *Id.* at 276. That was so even though police questioners clearly are not responsible for compulsory school attendance rules.[11]

I also reject the Government's argument that the UMC employees' statements to Hallford should be ignored for purposes of the *Miranda*-custody analysis. On the facts, the Government is simply incorrect that there is "no evidence that the agents said or did anything that would cause hospital staff to tell the defendant that he must submit to an interview." U.S.'s Suppl. Mem. 4. Rather, the very fact that the UMC staff members understood the interview to be mandatory supports the conclusion that the Secret Service agents' actions and statements gave them that impression. (It is unlikely, in other words, that the UMC employees arrived at that conclusion on their own accord.) Moreover, given the statements of the UMC staff members, it was more than reasonable for Hallford to conclude that they were acting, in that moment, not in their role as medical specialists, but as "agent[s] of the State" exercising the apparent authority of the Secret Service. *Estelle v. Smith*, 451 U.S. 454, 467 (1981); *cf. United States v. Straker*, 800 F.3d 570, 615 (D.C. Cir. 2015) (Custodial statements obtained by foreign officials are inadmissible in United States courts under *Miranda* if, when obtained, foreign officials "were acting as agents of" United States law enforcement officers.).[12]

---

[11] To the extent the Government relies on *Connelly* for its argument to the contrary, that reliance is misplaced. As I previously discussed, *Connelly* stands for the proposition that "suppression is an inappropriate remedy" when a defendant's mental impairments lead him to confess and the "police are completely unaware of the defendant's condition." *Hallford*, 103 F. Supp. 3d at 5 n.4. That is so because, in that situation, the police have not engaged in any "coercive" activity. *Connelly*, 479 U.S. at 167. By contrast here, whether the Secret Service agents' questioning of Hallford in his particular environment was coercive under *Miranda* is the central question we are trying to answer.

[12] The Government asserts that this case is "analogous in some ways to cases where an employment supervisor summons an employee to a law enforcement interview," cases which it says view employers'

In the final analysis, then, I disagree with the Government's contention that suppression in this instance "would 'serve absolutely no purpose in enforcing constitutional guarantees.'" U.S.'s Suppl. Mem. 7 (quoting *Connelly*, 479 U.S. at 166). To the contrary, suppression in this case will help "deter[] negligent or willful police misconduct that could impinge upon the Fifth Amendment right[s]" of individuals moving forward. *Straker*, 800 F.3d at 614. How so? By requiring, at a minimum, that law enforcement officials who coopt medical personnel to transport patients to an investigatory interview take steps to ensure that the patient is not, or has not been, misled about his rights while en route. When it comes to safeguarding the Constitutionally afforded privileges of the physically *and* mentally infirm such as Hallford, that seems, in this Court's judgment, not too much to ask.

## CONCLUSION

For the foregoing reasons, this Court GRANTS Hallford's Motion to Suppress Statements obtained in violation of *Miranda*.

RICHARD J. LEON
United States District Judge

---

statements as "irrelevant" to the *Miranda*-custody inquiry. U.S.'s Suppl. Mem. 8-9 (collecting cases). But a central premise of those employer cases is that a worker's "*voluntary* obligations to their employers" are distinguishable from "actions taken by law enforcement." *United States v. Laurita*, 821 F.3d 1020, 1027 (8th Cir. 2016) (emphasis added) (internal quotation marks omitted). As discussed previously, Hallford's presence at UMC was not voluntary. Nor was his decision to attend the interview; to the contrary, when Hallford asked whether he had to attend the interview, he was told yes.